# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-KA-01274-SCT

*TAMESHIA SHELTON a/k/a MICKEY*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/17/2015 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS, JR. |
| TRIAL COURT ATTORNEYS: | RODNEY A. RAY |
| | MARK TYLER JACKSON |
| | JEFFREY J. HOSFORD |
| COURT FROM WHICH APPEALED: | CLAY COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | RODNEY A. RAY |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LAURA H. TEDDER |
| DISTRICT ATTORNEY: | SCOTT W. COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/16/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., COLEMAN AND CHAMBERLIN, JJ.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.     On July 17, 2015, a Clay County jury convicted Tameshia Shelton of the murder of Daniel Young.  After the trial, Shelton filed a motion for judgment notwithstanding the verdict or in the alternative for a new trial.  The trial court denied the motion.  Shelton now appeals three issues.  First, Shelton challenges the sufficiency of the evidence.  Second, Shelton claims that the verdict is against the weight of the evidence.  Third, she alleges that the trial court erred by denying her requested two-theory jury instruction. Finding no error,

we affirm Shelton's conviction.

## FACTS AND PROCEDURAL HISTORY

¶2.    Ketina Tutton—Tameshia Shelton's younger sister—lived in the Mhoon Valley Community of Clay County ("Mhoon Valley") near West Point, Mississippi, and Daniel Young lived in Forest, Mississippi. Tutton and Young maintained a long-distance, romantic relationship, and Young often would visit Tutton in Mhoon Valley. Because Tutton lived with her mother, who disapproved of the couple cohabiting before marriage, Tutton and Young would sometimes spend the night together at Shelton's nearby residence.

¶3.    On Monday, October 12, 2009, Young arrived to visit Tutton for the week. Throughout the week, Tutton went to work at Sitel, Inc., in Starkville, Mississippi, and Young visited with Tutton's family.

¶4.    On Friday, October 16, Young spent a large portion of the day at Shelton's house. He repaired her car, changed her oil, and worked on an old truck parked at Shelton's house. At some point in the day, Shelton's cousin asked to see Shelton's .22 caliber revolver. She showed him the handgun and then cleaned and oiled all six of its chambers. Late in the afternoon, Shelton cooked dinner, and Young ate with Shelton and Tutton's mother at Shelton's house.

¶5.    Around 8:00 p.m., after running some errands, Tutton and Young returned to Tutton's house. While parked in the driveway, Tutton told Young that she was no longer planning to relocate to Meridian in the immediate future to be closer to Young as Sitel had hired her permanently. The couple had a heated discussion that lasted fifteen to twenty minutes before

2

they exited the car. Tutton testified that there was no physical altercation between her and Young. After the discussion, Tutton walked toward the rear of her mother's house, and Young walked toward Shelton's house along the driveway that connected the two houses. Tutton entered her mother's house and watched television with her mother and a sister.

¶6.     Sometime after Tutton saw Young walking toward Shelton's house, Shelton alleged that she heard a knock on her bedroom window.[1] Shelton claims that Young was at the window and asked her for her pistol in order to shoot a raccoon out of a tree. Young asked for just one bullet, but Shelton loaded six bullets into the handgun. Shelton claimed that she walked to the front room of the house and gave Young the handgun. She asked him to return and show her the raccoon once he had shot it.

¶7.     Shelton claimed to have heard one shot shortly after Young left her house. She alleged that she searched for Young, calling his name. According to Shelton, she found Young ten to fifteen yards from the driveway, lying face-down in the grass under a large tree. She claimed that Young was grunting. Shelton immediately called 911 and remained on the phone until officers responded to the scene. She reported the incident to the 911 dispatcher as "an accidental shooting" and mentioned—several times—that Young had intended to shoot a raccoon.

¶8.     Tutton—still at her mother's house—heard the gunshot but thought the sound was a firecracker exploding. It was not until a neighbor informed Tutton's mother of a shooting in Mhoon Valley that Tutton knew the sound had been a gunshot. Tutton drove to her

_____

    [1]Shelton was interviewed several times throughout the investigation. At trial, the State entered the recordings of her interviews into evidence and played them to the jury.

sister's house on the back driveway because her sister owned a black Mustang car, and the neighbor said that it was mentioned on the police scanner. After looking in Shelton's house, Tutton saw Shelton standing in the road. Shelton told Tutton that Young had been shot. Tutton found Young in the grass and "went crazy." She screamed and pulled her hair and clothing. Tutton remembered hearing sirens shortly after this.

¶9.    Deputy Cassandra Smith and Officer Torrey Williams ("Torrey"),[2] an auxiliary officer with Clay County, were the first responders to the scene. They saw Shelton standing in the middle of the road, pointing toward her house. Shelton was crying and appeared distressed. Smith followed Shelton up the driveway to where Young lay in the grass.

¶10.    Smith testified that Shelton was hysterically screaming, "You're late. You're late. He's dead." Smith called out to Young and touched his back but felt no movement. Shelton began searching for the pistol, prompting Smith to ask her if Young had been shot. Shelton kept repeating, "I've got to find the gun." She told Smith that the gun was an heirloom and that she had "to find it." Smith saw the pistol on the ground and did not mention it to Shelton. Instead, Smith escorted Shelton away from Young and back toward the front of the trailer. Smith then instructed Torrey to call Officer Ramirez Williams ("Ramirez")[3] and inform him that she suspected that there had been a murder.

¶11.    Smith said that Shelton remained hysterical and she noticed that Shelton was

---

[2] Officer Torrey Williams will be referred to by first name in order to avoid confusion with Officer Ramirez Williams.

[3] Officer Ramirez Williams will be referred to by first name in order to avoid confusion with Officer Torrey Williams.

4

constantly wiping her hands on her baby's blanket as she held her baby. Torrey also testified that Shelton was upset and constantly wiping her hands together when she was in the trailer later that evening.

¶12.    As Smith and Torrey began to cordon off the area around Young, Officer William Knowles responded to the scene. Knowles checked Young for a pulse but did not feel one. He then assisted the EMTs in turning Young over. The EMTs pronounced Young deceased, and Knowles took charge of Young's body and began a homicide investigation. Knowles noted the gunshot wound on Young's chest and discovered the handgun which lay below Young's feet.

¶13.    Once Ramirez arrived at the scene, he examined Young's body and the position of the handgun. He then briefly interviewed Shelton. Ramirez testified that, after inspecting the scene and interviewing Shelton, "it just wasn't looking like an accidental shooting to me."

¶14.    Next, Smith and Torrey escorted Shelton to the sheriff's department for a more detailed statement. Both officers testified that Shelton was calmer on the drive to the sheriff's department than earlier in the evening. On cross-examination, Torrey claimed that Shelton was no longer wiping her hands together, but on re-direct examination stated that Shelton was still wiping her hands together at the sheriff's department.

¶15.    Meanwhile, after photos had been made of the scene, Knowles recovered the handgun. He unloaded five unfired live casings along with one empty casing. Also, Officer Brad Pettit placed paper bags over Young's hands to preserve evidence. Ramirez and the other officers also performed a grid search for other evidence in the vicinity of Young's body. They

discovered evidence of a scuffle or altercation in the gravel driveway, five to ten yards from where Young's body lay. At the site of the scuffle, the officers recovered a banana hair-clip—with hair in it.

¶16. Around 12:00 a.m. the next morning, Ramirez interviewed Shelton again at the sheriff's department. Ramirez questioned Shelton about the scuffle that had occurred in the driveway. Shelton denied any knowledge of an altercation. She also denied wearing a banana hair-clip, but claimed that Tutton sometimes wore them. Without prompting—and for the first time by anyone in the investigation, Shelton raised the issue of gunpowder residue: "You can test my clothes to see if I have any powder on it [sic]. If I would have shot him, I would have gun residue all up my arms—gun burn." At the end of the interview, Ramirez conducted a gunshot residue test on Shelton and Tutton. The tests were sent to the Mississippi Crime Laboratory.

¶17. Over the next few days, Shelton was re-interviewed a number of times. Chief Deputy Eddie Scott interviewed Shelton on October 19. In this interview, Shelton claimed that she suffered from amnesia due to her hospitalization for seizures in January 2009. She also alleged that she was inside her house when the shot was fired. Further, Shelton claimed to have fired the handgun on Wednesday, October 14, at a stray dog in her yard. While she did not fire the handgun on October 16, she did claim to have cleaned it that afternoon.

¶18. Later in the afternoon of October 19, Agent Geoffrey Still interviewed Shelton. For the first time, Shelton claimed that she wore the same pajamas on October 14 when she shot at the stray dog as she did the night of October 16.

6

¶19.　On April 8, 2011, a Clay County grand jury indicted Shelton for murder.  After her indictment, Shelton was interviewed for a final time by Lieutenant Brett Watson on March 21, 2014.  Shelton claimed that Ramirez had sprinkled a substance onto her hands and looked at the substance under ultraviolet light.[4]  Ramirez denied doing so.  Shelton also was hesitant in answering whether or not Tutton and Young had fought that Friday before telling Watson that she did not remember.

¶20.　Shelton was tried for murder in Clay County from July 14 to July 17, 2015.  At trial, the State called several officers to testify to their personal knowledge of the events.  Still testified concerning his interview with Shelton that she appeared "evasive[]" and was "trying to distance herself from what was taking place."  He also noted the discrepancy that Shelton claimed to have amnesia but was able to recount the week before with great detail.

¶21.　Lisa Funte, a medical examiner who had conducted Young's autopsy, testified that she had examined the gunshot wound and determined that it was consistent with a small-caliber handgun, such as a .22.  She also had found a bullet inside Young.  Further, Funte testified that Young's death was a homicide.  Funte ruled out suicide as a cause of death because the path of the bullet did not have any deviation.[5]  The pathway of the bullet was

---

[4] As discussed *infra*, the results of the forensic testing revealed that Shelton did have particles indicative of gunshot residue on her hands and clothing.  Before this final interview, Shelton had been informed about the results of the forensic testing.  This statement appeared to be Shelton's attempt to discredit the results of the gunshot residue tests by claiming that Ramirez placed the gunshot residue on her hands.

[5] Funte explained in her testimony that when a person shoots himself in the chest "the bullet goes to one side or the other. She explained that this was the case because the person has to bend his or her wrist to hold the firearm and bring the barrel against the chest.

straight back and down. In addition to the autopsy, Funte performed a gunshot residue test on Young's hands and submitted the test to the Mississippi Crime Laboratory.

¶22. Felicia Robinson, a forensic scientist, testified that she had determined that the bullet recovered by Funte had been fired from Shelton's handgun. She also determined that the shell casing had been fired in the handgun. In addition, Robinson testified that her investigation revealed that the handgun had been fired from a contact or near-contact position against Young's chest in light of the burn marks on Young's clothes.

¶23. Jacob Burchfield, an analyst with the Mississippi Crime Laboratory, testified about the results of the gunshot residue tests. He stated that there were three ways for a person to have gunshot residue on them: (1) discharge a firearm, (2) be within two to three feet of a firearm as it is discharged, or (3) handle "something with gunshot residue on its surface." Burchfield testified that a person who shoots a firearm likely would have more residue on him than someone who was only in proximity to the firearm. He also testified that gunshot residue typically remains on a person's skin for four hours before a marked decrease is noted as a result of normal activity. Further, according to Burchfield, residue can remain in clothing indefinitely.

¶24. Burchfield testified that Young's test revealed particles indicative of gunshot residue on the backs of his hands.[6] Young's palms, though, tested negative for gunshot residue.

---

[6] Burchfield testified that three types of results were reported by the Mississippi Crime Laboratory: positive, negative, and indicative. A "positive" result was reported when gunshot residue was found. A "negative" result was reported when there was no gunshot residue found. Lastly, an "indicative" result was reported when at least three out of four of the categories of particles in gunshot residue were found.

Shelton's test also revealed particles indicative of gunshot residue on her palms and the back of her right hand. Her test also revealed particles indicative of gunshot residue on Shelton's pajamas—both the pants and the shirt. Burchfield also testified that Tutton's test was negative for gunshot residue.

¶25. Also at trial, Tutton testified to her memory of the events leading up to and after Young's death. She alleged that she had informed Ramirez about a time when Young almost overdosed on pain pills after a dental procedure. On direct examination, Tutton claimed that she told Ramirez about the incident in response to an open-ended question about any concerns that she had had about Young during their relationship. On cross-examination, though, Tutton admitted that she had not been asked a question by Ramirez before she had volunteered the information on her own. Tutton also admitted that she had not been concerned about suicide the night that Young died.

¶26. Edith Young—Daniel Young's mother—testified that her son did not have a history of mental illness, and had not, to her knowledge, contemplated suicide. She also stated that her son had not taken a number of pain pills after a dental procedure that he had when he was living in Nashville, Tennessee.

¶27. After the conclusion of the testimony, the trial court instructed the jury—including two instructions that each addressed circumstantial evidence. The jury then convicted Shelton of first-degree murder. The trial court sentenced Shelton to a life sentence in the custody of the Mississippi Department of Corrections. Shelton filed a motion for judgement notwithstanding the verdict or in the alternative for a new trial, and the trial court denied this

motion.  Shelton now timely appeals.

## ANALYSIS

¶28.    To convict Shelton of murder, the State had to prove that Shelton (1) killed Young (2) with the deliberate design to effect the death of Young and (3) without the authority of law and not in necessary self-defense.  *See* Miss. Code Ann. § 97-3-19(1)(a) (Supp. 2016).[7]

### I.    The evidence presented at trial was legally sufficient to support the verdict.

¶29.    This Court reviews a challenge to the sufficiency of the evidence under the standard detailed in **Bush v. State**, 895 So. 2d 836, 843 (Miss. 2005).  We recognize that "the critical inquiry" under the standard is whether the evidence supports a finding that the accused "committed the act charged . . . under such circumstances that every element of the offense existed."  **Id**.  "'[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  **Id**.  (quoting **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (emphasis in original)).  Further:

> if a review of the evidence reveals that it is of such quality and weight that, "having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense," the evidence will be

---

[7] Mississippi Code Annotated Section 97-3-19(1)(a) reads as follows:

(1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:

> (a) When done with deliberate design to effect the death of the person killed, or of any human being, shall be first-degree murder; . . . .

deemed to have been sufficient.

*Id*.; *see also* **Roby v. State**, 183 So. 3d 857, 869 (Miss. 2016).

¶30. We find that the evidence was sufficient to support the conviction of murder. The evidence was undisputed that Young was killed. Ample expert testimony demonstrated that he was killed from a single round fired from the handgun recovered at the scene. Shelton admitted that she owned this handgun and stated—multiple times, in separate interviews—that she loaded the weapon before Young was shot. Shelton also had gunshot residue on her hands and pajamas. In addition, she was the first person in the investigation to reference gunshot residue when she stated in an interview soon after the shooting: "You can test my clothes to see if I have any powder on it. [sic] If I would have shot him, I would have gun residue all up my arms—gun burn." Further, there was no evidence to show that Shelton was acting in self-defense. All the evidence together was sufficient since a rational trier of fact could establish each element beyond a reasonable doubt.

¶31. The forensic evidence supported the jury's determination that Shelton had fired the firearm. Burchfield testified that he would expect to see more gunshot residue on the person who discharged the firearm than on a person who was only in the vicinity of the discharged firearm. The results of the forensic tests demonstrated that Shelton did have more gunshot residue on her skin at the time of testing than Young did. This was the case even though Young's hands were placed inside paper bags to preserve the gunshot residue on them. Also, more gunshot residue was present on Shelton's hands than on Young's hands despite the fact that she was tested four hours after the shooting—after she had continued to wipe her hands.

11

Burchfield also testified that normal activity over a period of four hours would significantly reduce the amount of gunshot residue on a person's hands. While Shelton claimed to have cleaned the firearm earlier in the day, she cleaned the firearm well over four hours before the shooting and prepared and ate dinner in the interim. Thus, it is not likely that the gunshot residue was on Shelton from handling the firearm earlier that day. This evidence supported the argument that Shelton fired the firearm the evening that Young died.

¶32. The combined evidence also allowed the jury to determine that Shelton had shot Young deliberately. Funte testified that she had determined Young's death to be a homicide based on the trajectory of the bullet. Robinson's testimony supported Funte's conclusion, as the weapon was fired from a contact or near-contact position. Ramirez also testified to his impression that the shooting was not accidental. Further, the evidence of the scuffle or altercation, along with Shelton wiping her hands after the shooting, was sufficient to support the jury's determination that Shelton intended to shoot Young.

¶33. There also was no evidence that Shelton's intentional killing was justified by law. None of the forensic evidence supported a theory of self-defense. There was no testimony to support such a claim either.

¶34. Further, there was evidence that showed that Young did not commit suicide. Young's mother testified that, to her knowledge, Young had not attempted suicide and did not have any mental illnesses. Additionally, Funte's testimony concerning the trajectory of the bullet in Young's body demonstrated that suicide would have been unlikely.

¶35. Beyond the testimony and forensic evidence, there was reason for the jury to doubt

Shelton's account of the evening. She claimed to suffer from amnesia but was readily able to recount the events of the week in great detail. She also insinuated that the police planted the gunshot residue on her—an allegation that was not supported by any evidence in the record. Thus, the jury had reason to doubt Shelton's account.

¶36. Under our standard of review, the question before us is not whether we believe that the evidence established guilt beyond a reasonable doubt. Instead, it is whether, after viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. We find that each element of the crime is supported by sufficient evidence.

**II.     The verdict is not against the weight of the evidence.**

¶37. When reviewing a challenge that the verdict is against weight of the evidence, this Court "will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." ***Bush***, 895 So. 2d at 844. Under this standard, "the evidence should be weighed in the light most favorable to the verdict." ***Id***.

¶38. We find that the verdict is not against the weight of the evidence. Much of the analysis under the sufficiency of the evidence applies to this discussion as well. The forensic evidence presented at trial demonstrated that Shelton had shot Young. In addition, the trajectory of the bullet through Young's body made the theory of suicide highly unlikely. Further, Young did not have any known mental illnesses and had not attempted suicide. Weighing the evidence "in the light most favorable to the verdict," we conclude that the

13

verdict is not against the weight of the evidence.

### III. The trial court's refusal of the two-theory jury instruction was not an abuse of discretion.

¶39. Shelton argues that the trial court erred in refusing her requested two-theory jury instruction.[8] This Court reviews the grant or refusal of a jury instruction "under an abuse-of-discretion standard." *McInnis v. State*, 61 So. 3d 872, 875 (Miss. 2011). The trial court is "allowed to refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Roberson v. State*, 199 So. 3d 660, 664 (Miss. 2016). "Jury instructions must be read as a whole to determine if they fairly announce the law." *McInnis*, 61 So. 3d at 875 (citations omitted).

¶40. "Circumstantial evidence is 'evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact does exist.'" *Id*. (quoting *Keys v. State*, 478 So. 2d 266, 268 (Miss. 1985)). The trial court is allowed to "refuse a two-theory instruction *if* it has granted a (general) circumstantial evidence instruction." *Id*. (emphasis in original); *see also* **Goff v. State**, 14 So. 3d 625, 662 (Miss. 2009) (quoting

---

[8] "A two-theory instruction instructs the jury what to do when the 'record supports two or more hypotheses of the crime committed' and all the evidence of the crime is circumstantial." *McInnis v. State*, 61 So. 3d 872, 875 (Miss. 2011). The instruction refused here, Instruction D-6, provided:

> The Court instructs the jury that if the State has relied on circumstantial evidence to establish its theory of guilt of the Defendants, then the evidence for the State must be so strong as to establish the guilt of the Defendant, not only beyond a reasonable doubt, but the evidence must be so strong as to exclude every other reasonable hypothesis other than that of guilt.

*Kitchens v. State*, 300 So. 2d 922, 926 (Miss. 1974)) ("'In a case based entirely on circumstantial evidence, if an instruction is allowed that the evidence must exclude every reasonable theory other than that of guilt, that is held to embody the essentials of the two-theory instruction, and refusal of the latter is not reversible error.'").

¶41. We find that the trial court did not abuse its discretion in denying the requested two-theory instruction since two other jury instructions fairly instructed the jury as to the law. Further, it is not necessary for us to determine whether the evidence against Shelton was completely circumstantial because a trial court, under *McInnis*, may refuse a two-theory instruction—even where all of the evidence is circumstantial—if it has given a circumstantial evidence instruction as the trial court did here.

¶42. The trial court gave Instruction C-12, a circumstantial-evidence instruction, which read:

> The Court instructs the jury that the law presumes every person charged with the commission of a crime to be innocent. This presumption places upon the State the burden of proving the Defendant guilty beyond a reasonable doubt and *to the exclusion of every reasonable hypothesis consistent with innocence*. The presumption of innocence of the Defendant prevails unless overcome by evidence which satisfies the jury of the Defendant's guilt beyond a reasonable doubt and *to the exclusion of every reasonable hypothesis, consistent with innocence*. The Defendant is not required to prove his or her innocence.

(Emphasis added.) The language of this instruction fairly instructed the jury on the law governing circumstantial evidence. While the refused, two-theory instruction included stronger language concerning circumstantial evidence, it did not provide instruction that was materially different or additional to the law covered in Instruction C-12. The trial court also instructed the jury with Instruction S-2A:

15

The Court instructs the Jury that if you find from the evidence in this case beyond a reasonable doubt and *to the exclusion of every reasonable hypothesis consistent with innocence* that the Defendant, Tameshia Shelton, did on or about October 16, 2009, unlawfully, willfully, feloniously, purposely and knowingly with the deliberate design to effect death, kill and murder Daniel Young, a human being without authority of law and not in necessary self-defense[, t]hen you shall find the Defendant guilty as charged. If the State has failed to prove any of these elements beyond a reasonable doubt and *to the exclusion of every reasonable hypothesis consistent with innocence*, then you shall find the Defendant not guilty.

(Emphasis added.) This instruction reinforced Instruction C-12's guidance on circumstantial evidence. Thus, we find that the trial court did not abuse its discretion by refusing the two-theory instruction.

## CONCLUSION

¶43. The evidence was legally sufficient to support the verdict and the verdict is not against the overwhelming weight of the evidence. Further, the trial court did not abuse its discretion when it refused Shelton's requested instruction. Thus, finding no error, we affirm Shelton's conviction and sentence.

¶44. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KITCHENS, KING, COLEMAN, MAXWELL AND BEAM, JJ., CONCUR.**

16