# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-00163-COA

JAVONDUS BEASLEY A/K/A JAVONDUS M.         APPELLANT
BEASLEY A/K/A JEWMAN

v.

STATE OF MISSISSIPPI                          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 01/10/2018 |
| TRIAL JUDGE: | HON. JEFF WEILL SR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: KAYLYN HAVRILLA McCLINTON |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 10/15/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

EN BANC.

J. WILSON, P.J., FOR THE COURT:

¶1. Following a jury trial in the Hinds County Circuit Court, Javondus Beasley was convicted of one count of capital murder and two counts of second-degree murder. On appeal, Beasley argues that his convictions must be reversed because of multiple alleged errors in his trial. Based on our Supreme Court's decision in *Moore v. State*, 247 So. 3d 1198 (Miss. 2018), we conclude that the denial of Beasley's request for a circumstantial evidence instruction was reversible error. Therefore, we reverse Beasley's convictions and remand

for a new trial.

**FACTS AND PROCEDURAL HISTORY**

¶2. Around 1 p.m. on October 30, 2013, Barbara Taylor dropped off her sister Ashley Taylor at the home of Ashley's boyfriend, Sharrod Brown. Brown lived with his brother Eldra Gibson on Moon Street in Jackson. Barbara planned to pick Ashley up after she got off of work around 11 p.m. Barbara called Ashley at 10:56 p.m., but Ashley did not answer, so Barbara did not go to pick her up. Barbara tried to call Ashley again at 12:05 a.m. and 1:02 a.m. on October 31, but Ashley still did not answer. Around 8 a.m., Barbara called Ashley several times, but there was still no answer. Barbara also tried to call Brown and Gibson, but they did not answer either.

¶3. Around 10:30 a.m., Barbara went to Brown's house to check on Ashley. She knocked on the door, but no one answered. The door was unlocked so she entered the house. She noticed "a lot of debris and things on the floor" in the front room. She then found Ashley, Brown, and Gibson. All three were dead, each as the result of a single gunshot to the head. Ashley and Brown were in a rear bedroom. Gibson was in an adjacent bedroom. Barbara called 911.

¶4. The Jackson Police Department (JPD) arrived and secured the crime scene. The bullets that killed Ashley and Brown were recovered, and a ballistics expert testified that they were fired by the same nine millimeter gun. The bullet that killed Gibson was recovered from a wall. It was also fired by a nine millimeter gun, but it was not tested or compared to the other two bullets. No murder weapon was ever recovered. Only one spent shell casing

2

was found at the scene.

¶5.     There are two entrances to the Moon Street house: a side door that opens into the kitchen and the front door facing the street.  The side door consists of an outer screen/storm door that opens outward and an interior wood door that opens inward.  The interior door was unlocked and "ajar when [JPD] arrived."  However, Sergeant Robert Buffkin noted that a nail had been inserted into the outer wood door frame "to help secure the storm door," i.e., to keep the door from opening outward.  Buffkin testified that there were no visible signs of forced entry into the side door.  Buffkin also testified, "The rusted nail [in the door frame] was there and looked like it's been there for a while.  It was undisturbed.  It appears nobody entered or exited this particular storm door."  Based on his observations regarding the side door, Buffkin concluded that the murderer must have entered the house through the front door.  On cross-examination Buffkin acknowledged that he did not touch the nail in the side door frame, test to see if it could be removed, or even try to "wiggle" it.  Photographs of the side door and the nail are attached as an appendix to this opinion.

¶6.     A video camera was mounted next to the front door of the house facing Moon Street.  The camera was motion-activated, meaning that it recorded only when a motion sensor detected movement within the view of the camera's lens. The video footage from the camera was saved to an SD card in the camera.

¶7.     Footage from the camera showed Beasley approach the front door of the house at 10:48 p.m. on October 30.  He knocked on the door, and someone opened the door and let him in.  Beasley left the house alone at 11:40 p.m.  He was carrying a plastic bag in his left

hand, and there appeared to be a bulge under the left side of his jacket. The hood of his jacket partially obscured his face, and he appeared to be perspiring. Beasley walked out the front gate to the street and departed.

¶8. Footage from the camera also showed that around 12:30 a.m. on October 31, a car parked on the street near the front gate. A man got out of the car and knocked on the front door to the house, but no one answered. The man then went back to the car and left. The camera did not show anyone else approaching or entering the house until Barbara arrived around 10:30 a.m.

¶9. The police identified Beasley and brought him in for questioning on October 31. Beasley waived his *Miranda* rights and acknowledged that the video showed him enter the house at 10:48 p.m. and exit at 11:40 p.m. on October 30. Beasley lived with his grandmother on Moon Street just two houses down from Gibson and Brown. He told the police that he went to see Gibson on October 30 to smoke marijuana with Gibson and buy marijuana from him. Beasley stated that he had been drinking, taking Xanax, and smoking marijuana before he went to see Gibson. Beasley denied any involvement in the murders.

¶10. Beasley's testimony at trial was consistent with his statements to police. He testified that he and Gibson had been friends all his life. He reiterated that he went to Gibson's house on October 30 to smoke marijuana with Gibson and to buy marijuana from him. Beasley said that he and Gibson hung out in the living room and that he never saw Brown or Ashley. According to Beasley, he and Gibson smoked three or four joints, and then Gibson sold him a half pound of marijuana, which was about the size of a football. Beasley testified that he

4

put the marijuana under his jacket, which accounted for the bulge in his jacket in the video. Beasley said that he concealed the marijuana because he did not want it to be visible to his grandmother or any police who might drive by. Beasley testified that the plastic bag that he carried in the video contained a pair of pants. He claimed that he borrowed the pants from Gibson to use as a cover story in case his grandmother asked him why he had been at Gibson's house. Beasley said that his grandmother would have kicked him out of her house if she knew that he went to Gibson's house to buy marijuana. Beasley testified that Gibson was alive when he left, and he denied that he committed the murders.

¶11. The jury found Beasley guilty of capital murder for killing Gibson during the commission of a robbery and two counts of second-degree murder for killing Brown and Ashley.[1] The circuit court sentenced Beasley to life imprisonment plus two consecutive terms of forty years' imprisonment. Beasley filed a motion for a judgment notwithstanding the verdict or new trial, which the circuit court denied, and a notice of appeal.

## ANALYSIS

¶12. Beasley raises four issues on appeal. However, we conclude that one issue is dispositive and therefore limit our discussion to that issue. Specifically, we conclude that the circuit court's denial of Beasley's request for a circumstantial evidence instruction was reversible error in light of our Supreme Court's decision in *Moore*, *supra*.

¶13. At trial, Beasley requested two circumstantial evidence jury instructions: D-11, a

---

[1] Beasley was indicted for three counts of capital murder. On each count, the jury was instructed on capital murder and the lesser-included offenses of first-degree murder and second-degree murder.

"two-theory instruction,"[2] and D-12, which combined language from a two-theory instruction with language from a general circumstantial evidence instruction.[3] At the charge conference, the State conceded that Beasley was "entitled" to a circumstantial evidence instruction because the case against him was "completely circumstantial." The State only requested an opportunity to submit a general circumstantial evidence instruction for the trial judge to consider giving in lieu of Beasley's proposed instructions.[4] The State then submitted a

---

[2] Beasley's proposed instruction D-11 read as follows:

The Court instructs the jury that if there are two plausible theories arising out of the evidence in this case, and one tends to prove that Javondus Beasley killed [the victims], and another tends to prove that some other person or persons killed [the victims], and if the jury is unable to determine from the evidence which of the two theories is true, the jury must accept that theory most favorable for Javondus Beasley and find him not guilty.

[3] Beasley's proposed instruction D-12 read as follows:

The Court instructs the jury that if there is a fact or circumstance in this case susceptible to two interpretations, one favorable and the other unfavorable to Javondus Beasley, and when the jury has considered said fact or circumstance with all other evidence, and there is a reasonable doubt as to the correct interpretation, then you, the jury, must resolve such doubt in favor of Javondus Beasley, and place upon such fact or circumstance the interpretation most favorable to Javondus Beasley.

The Court instructs the jury that if you can reconcile the evidence upon any reasonable hypothesis consistent with Javondus Beasley's innocence, you should do so and find him not guilty.

[4] A "two-theory instruction" is a special kind of circumstantial evidence instruction. *Johnson v. State*, 235 So. 3d 1404, 1412 (¶22) & nn.8-9 (Miss. 2017) (discussing the difference between a two-theory instruction and a general circumstantial evidence instruction); *Shelton v. State*, 214 So. 3d 250, 257-58 (¶¶39, 42) & n.8 (Miss. 2017) (same). Our Supreme Court has held that a trial judge has discretion to deny a two-theory instruction and give only a general circumstantial evidence instruction. *Johnson*, 235 So. 3d at 1413 (¶¶25-27); *Shelton*, 214 So. 3d at 258-59 (¶¶41-42).

6

general circumstantial evidence instruction (S-19) that the Supreme Court had quoted with approval in *Shelton*, 214 So. 3d at 258 (¶42).[5]

¶14.    Despite the State's concession that Beasley was entitled to a circumstantial evidence instruction, the trial judge announced the following morning that he would not give one. The judge stated that he had done "some additional legal research overnight" and while it was "an extremely close question of law," he found that the surveillance video was "direct evidence," which made it unnecessary to give a circumstantial evidence instruction. The judge acknowledged that there was no direct evidence that Beasley killed anyone. However, the judge reasoned that the video of Beasley leaving the house with a package under his jacket was "direct evidence" of the underlying felony on the capital murder charges, i.e., robbery. The judge also emphasized that the video showed that no one else entered or exited the house after Beasley left.

¶15.    On appeal, Beasley argues that the trial judge committed reversible error by refusing to give a circumstantial evidence instruction. In response, the State notes that the trial judge refused to give such an instruction because he "determined the surveillance video constituted direct evidence." However, the State's brief on appeal does not actually defend that ruling.

---

[5] Proposed instruction S-19 read as follows:

The Court instructs the jury that the law presumes every person charged with the commission of a crime to be innocent. This presumption places upon the State the burden of proving the Defendant guilty beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence. The presumption of innocence of the Defendant prevails unless overcome by evidence which satisfies the jury of the Defendant's guilt beyond a reasonable doubt and to the exclusion of every reasonable hypothesis, consistent with innocence. The Defendant is not required to prove his innocence.

Rather, the State argues that "[a]ny error" was "harmless" in light of the "overwhelming" evidence of Beasley's guilt.

## I. Beasley was entitled to a circumstantial evidence instruction.

¶16. If the case against a defendant is entirely circumstantial—that is, if there is no direct evidence of the gravamen of the offense charged—then the defendant is entitled to a circumstantial evidence instruction, and it is an abuse of discretion for the court to refuse such an instruction. *Moore*, 247 So. 3d at 1201-03 (¶¶16-22). Our Supreme Court has stated that "[d]irect evidence . . . must directly *and not by inference* implicate the accused and not just show that there has been a crime." *Burleson v. State*, 166 So. 3d 499, 509 (¶29) (Miss. 2015) (emphasis added, quotation marks omitted). Direct evidence includes a confession, the testimony of an eyewitness to the gravamen of the offense, or surveillance video of the gravamen of the offense. *Moore*, 247 So. 3d at 1201-02 (¶¶16, 19). In contrast, the Supreme Court "has defined circumstantial evidence as evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact does exist." *Burleson*, 166 So. 3d at 509 (¶29) (quotation marks omitted).

¶17. "To remove [a] case from the circumstantial evidence realm, the State [bears] the burden of adducing evidence to show directly, and not merely by inference, that [the defendant committed the crime charged]." *Moore*, 247 So. 3d at 1202 (¶17). "[E]vidence that implicates the defendant by inference is circumstantial evidence" no matter "how persuasive" or "compelling" the "inference appears to be." *Id.* "Moreover, the sum of circumstantial evidence, however great it may be[,] . . . never becomes direct evidence." *Id.*

8

"When serious doubt exists as to whether an instruction should be included, the doubt should be resolved in favor of the accused." *Burleson*, 166 So. 3d at 509 (¶28) (brackets omitted).

¶18. The Supreme Court's decision in *Moore* is instructive. In *Moore*, the defendant (Everett Moore) had accused the victim (Norris Smith) of having an affair with Moore's wife. *Moore*, 247 So. 3d at 1199 (¶2). Surveillance video showed Moore sitting in his SUV in the parking lot of Smith's workplace, waiting for Smith. *Id.* at 1210 (¶53) (Maxwell, J., dissenting). When Smith left work and got into his Nissan, Moore's SUV pulled behind the Nissan. *Moore*, 247 So. 3d at 1199 (¶3). Moore exited his SUV and leaned on the driver's side of the Nissan to talk to Smith. *Id.* After a brief conversation, Moore returned to his SUV and drove to another part of the lot. *Id.* Smith's Nissan then pulled out of the lot, and Moore's SUV followed it. *Id.* at 1199-1200 (¶¶3-4). Video footage showed the SUV and the Nissan drive side by side down the road until the Nissan came into contact with a curb and the SUV slowed to fall behind the Nissan. *Id.* at 1200 (¶5). Finally, footage showed the Nissan strike the curb again and then proceed "uncontrollably" down the road, through a red light, and over a curb before coming to rest at the bottom of an embankment. *Id.* at (¶¶5-6). The Nissan's driver's side window was broken out, and Smith was found slumped over with a gunshot wound to his head. *Id.* at 1199-1200 (¶¶2, 7).

¶19. In addition to the surveillance video introduced in *Moore*, a witness testified that he heard two gunshots just before Smith's Nissan went through the intersection, that he saw broken glass, and that Smith had been shot. *Id.* at 1200 (¶7). Another witness identified Moore and testified that Moore's SUV nearly struck his car before Moore accelerated, ran

9

a red light, and drove away. *Id.* at (¶8); *id.* at 1210 (¶53) (Maxwell, J., dissenting). Moore later turned himself in and admitted that he had been in the parking lot at Smith's place of work. *Moore*, 247 So. 3d at 1200 (¶9). Moore also mentioned a text message between Smith and his wife. *Id.* When Moore turned himself in, he was wearing different clothes and driving a different vehicle. *Id.* at 1210 (¶53) (Maxwell, J., dissenting). The police later determined that the interior and exterior of Moore's SUV had been wiped down with cleaning agents, and large jugs of cleaning materials were found in the SUV. *Id.* The trial judge denied Moore's request for a circumstantial evidence instruction, and Moore was convicted of second-degree murder. *Moore*, 247 So. 3d at 1201 (¶¶11, 13).

¶20. On appeal, the Supreme Court reversed. The Court acknowledged that the State presented "copious" circumstantial evidence that supported an "inference . . . that [Moore] did, in fact, shoot [Smith]." *Id.* at 1202 (¶19). "But inferences do not amount to direct evidence," and no video showed—and no eyewitness could testify—that Moore shot Smith. *Id.* at (¶¶17, 19). Therefore, in the absence of any direct evidence that Moore committed the gravamen of the offense, the Supreme Court held that the trial judge abused his discretion by denying Moore's request for a circumstantial evidence instruction. *Id.* at (¶20).

¶21. As in *Moore*, there is no direct evidence in this case that Beasley shot the victims. Surveillance video shows Beasley entering the house and exiting later, but that only supports an inference that Beasley did, in fact, shoot the victims while he was inside. Thus, the video is not direct evidence of the murders.

¶22. The trial judge in this case acknowledged that there was "no per se direct evidence . . .

10

concerning the deaths of the three victims." However, citing the Supreme Court's decision in *Burleson*, *supra*, the trial judge concluded that a circumstantial evidence instruction was unnecessary because there was direct evidence that Beasley committed the felony underlying the capital murder charge, i.e., robbery. Specifically, the trial judge reasoned that the video showed that Beasley exited the front door of the house with some unidentifiable "object" concealed under his jacket. The trial judge also emphasized that the video showed no other person exiting the house during the relevant time period.

¶23. With respect, *Burleson* demonstrates that a circumstantial evidence instruction was necessary and should have been given. Like Beasley, Burleson was indicted for capital murder with the underlying felony of robbery. *Burleson*, 166 So. 3d at 505 (¶12). Although there was no direct evidence that Burleson committed the murder, the Supreme Court held that "the underlying felony in a capital felony-murder charge constitutes the gravamen of the offense of capital murder." *Id.* at 509-10 (¶¶31, 34). Therefore, "direct evidence of the underlying felony obviates the need for a circumstantial-evidence instruction in capital-murder cases." *Id.* at 510 (¶32). Accordingly, the Court proceeded to "determine whether the State presented any direct evidence of a robbery." *Id.* at 511 (¶34). A witness (Cartwright) testified that she saw Burleson and his accomplice (Huguley) take a flat-screen TV and other items from the victim's home. *Id.* at 504, 511 (¶¶9, 35). The State argued that Cartwright's testimony was "direct evidence of the 'taking' element of robbery." *Id.* at 511 (¶35). The Supreme Court rejected the State's argument, reasoning as follows:

> [E]vidence of a mere taking does not constitute the gravamen of the offense of robbery. Robbery includes the elements of larceny, but with the additional

11

element of force or putting in fear as a means of effectuating the felonious intent. The State was required to prove the elements of robbery, not merely larceny, to obtain a conviction of capital murder. Because the State could not prove that a robbery had occurred without presenting evidence of violence or threat of violence, we hold that this element is the gravamen, or substantial point or essence[,] of the offense of robbery. In the instant case, the State presented no eyewitness testimony that Burleson took [the victim's] personal property from him by violence or by putting him in fear of immediate injury. Cartwright's testimony proved only that Huguley and Burleson had taken items from the [victim's] house, and the jury was left to infer from the rest of the evidence how they obtained those items.

*Id.* (quotation marks, citations omitted). Because the State presented no direct evidence of the murder or the underlying felony of robbery, the Supreme Court held that the trial judge abused his discretion by refusing to give a circumstantial evidence instruction. *Id.* at (¶37).

¶24. The relevant facts in this case are not materially distinguishable from *Burleson*. The surveillance video shows Beasley taking items from Brown's house, but there is no direct evidence that he took those items by force or fear from the person or presence of any of the victims. Beasley claimed that the items were a pair of pants that he borrowed from Gibson and a bag of marijuana that he bought from Gibson. There was no direct evidence of the gravamen of the offense of robbery. "[T]he jury was left to infer from the rest of the evidence how [Beasley actually] obtained those items." *Id.* at (¶35). "[E]vidence that implicates the defendant by inference is circumstantial evidence" no matter "how persuasive" or "compelling" the "inference appears to be." *Moore*, 247 So. 3d at 1202 (¶17). Accordingly, as in *Burleson*, a circumstantial evidence instruction was required. *Burleson*, 166 So. 3d at 511 (¶37).

## II. The error cannot be deemed harmless.

¶25. As noted above, the State argues that the denial of a circumstantial evidence instruction was harmless error. In *Burleson* and prior cases, the Supreme Court "rejected the proposition that the failure to give such an instruction can be harmless error." *Id.* However, in *Moore*, the Supreme Court stated: "A set of facts could arise in which this Court finds the trial court's failure to give a circumstantial evidence jury instruction in a circumstantial evidence case to have been harmless error." *Moore*, 247 So. 3d at 1204 (¶26). Thus, the Supreme Court has now allowed for the possibility that such an error could be harmless. But the Court also found that *Moore* did "not present such a fact pattern," and the Court "decline[d] to speculate about a hypothetical scenario" in which the denial of a circumstantial evidence instruction might be harmless. *Id.*

¶26. In light of the Supreme Court's decision in *Moore*, we cannot find that the error in this case was harmless. As the dissent in *Moore* discussed, the evidence of Moore's guilt was "overwhelming." *Id.* at 1210-11 (¶¶52-56) (Maxwell, J., dissenting).[6] As described above (*see supra* ¶¶18-19), surveillance video captured virtually everything leading up to the fatal shots, witnesses heard those fatal shots and then saw Moore flee the scene, and there was other circumstantial evidence of Moore's guilt and motive to kill Smith. The evidence of Moore's guilt truly was overwhelming, but the Supreme Court still held that the "fact pattern" did not support a finding of harmless error. *Moore*, 247 So. 3d at 1204 (¶26). Therefore, the Court held that the failure to give a circumstantial evidence instruction required a new trial. *Id.* at 1205 (¶31).

---

[6] The majority in *Moore* did not dispute the dissent's characterization of the weight of the evidence. *Moore*, 247 So. 3d at 1204 (¶29).

13

¶27. The circumstantial evidence in this case is no more compelling or overwhelming than in *Moore*. Indeed, if anything, the evidence of guilt in this case seems less definitive. Here, we have only the surveillance video of Beasley entering and exiting the house where the murders were committed—no other evidence was presented to tie Beasley to these murders. Whether or not this Court agrees with the reasoning of the Supreme Court or the result in *Moore*, we cannot distinguish *Moore* with respect to the issue of harmless error.

¶28. On appeal, the State does not attempt to distinguish *Moore* but argues that the surveillance video in this case "proved that no one entered the house after Beasley left." Citing Sergeant Buffkin's testimony, the State asserts that the "side door to the home . . . was nailed shut" so that "the only way in and out of the home was through the front door."

¶29. The rusty nail in the side door frame cannot bear the weight that the State places upon it. As noted above, two photographs of the side door and the nail are attached as an appendix to this opinion. They show a single nail in a crack or split in the outside part of the door frame, apparently to keep the screen door from opening. Sergeant Buffkin stated that the nail was "rusted," "undisturbed," and "looked like it's been there for a while." He thought that "[i]t appear[ed] nobody entered or exited this particular storm door." However, Buffkin also testified that he did not touch the nail. He did not test the nail to see if it could be removed manually or with a tool or even try to "wiggle" it. He also testified that the interior door was "ajar when [the police] arrived," so it posed no apparent barrier to entry.

¶30. We cannot agree with the State that the presence of this single nail eliminates the possibility that someone other than Beasley entered the house through the side door. The nail

14

could have been removed to gain entry and reinserted into the door frame after the crime was committed. Defense counsel made this very point during closing argument.[7] To use the language of the standard circumstantial evidence instruction, a given juror may or may not consider that to be a "reasonable hypothesis." *Moore*, 247 So. 3d at 1201 (¶16). But that hypothesis is at least as likely or as plausible as the hypothesis that someone other than Everett Moore killed Norris Smith. Despite the overwhelming evidence of Moore's guilt, the Supreme Court held that the denial of a circumstantial evidence instruction was not harmless error. The majority in *Moore* apparently viewed circumstantial evidence instructions as essential to a "fair trial" in a circumstantial evidence case, *Moore*, 247 So. 3d at 1204 (¶26), and the result in *Moore* indicates that it will be a rare case when the denial of such an instruction can be deemed harmless.

¶31. This Court cannot apply the harmless-error rule in a vacuum. Rather, our Supreme Court's decisions in similar cases must inform and ultimately must control our harmless-error

---

[7] Counsel argued:

[The State] ignored the side door. They saw a door with an old rusted nail in the frame and they said hey, hey, there's no way anybody can come through this door. There's a nail here. Done, move on to the next thing. Well, ladies and gentlemen, I'm gonna tell you right now. ADT is about to be really upset that they're about to go out of business. Because we don't need security systems on our home anymore. Because all we need is a nail. The nail is gone keep everybody from coming in and out of our house forever. There's [no] reason to dead bolt locks, there's no reason to lock a handle, there's no reason for chains anymore. We can just use a nail and be done with it. It's over. There's no reason to worry about security anymore when all we need is a nail. . . . Officer Buffkin said he saw the nail but didn't touch it, didn't do anything with it. . . . [H]e didn't even see whether or not it moved. He didn't see whether it was tight. He didn't tell us anything about the nail other than he saw the nail there.

analysis. *See Thompson v. State*, 230 So. 3d 1044, 1055 (¶36) (Miss. Ct. App. 2017) ("We are bound by [Supreme Court precedent] and the principle that 'like cases ought to be decided alike.'") (quoting *State ex rel. Moore v. Molpus*, 578 So. 2d 624, 634 (Miss. 1991)). With respect to the issue of harmless error, we are unable to identify any meaningful or material distinction between this case and the fact pattern in *Moore*. Therefore, we cannot say that the error in this case was harmless, and we are bound to hold that the denial of Beasley's request for a circumstantial instruction requires a new trial. *Moore*, 247 So. 3d at 1204-05 (¶¶26, 31).

**CONCLUSION**

¶32.    Applying *Moore*, we conclude that the denial of Beasley's request for a circumstantial error instruction was reversible error. Therefore, we reverse Beasley's convictions and remand the case for a new trial.

¶33.    **REVERSED AND REMANDED.**

    **BARNES, C.J., GREENLEE, WESTBROOKS, McDONALD, McCARTY AND C. WILSON, JJ., CONCUR.  LAWRENCE, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, P.J., AND TINDELL, J.**

    **LAWRENCE, J. , DISSENTING:**

¶34.    Because I would find that the circuit court's failure to give a circumstantial-evidence instruction was harmless error, I respectfully dissent. At trial, the surveillance video was admitted into evidence and played for the jury. Since the surveillance camera only recorded the front of the house, and not inside (where the murders occurred), Beasley requested a circumstantial-evidence instruction. Beasley argued that the circuit court erred when it

16

denied his request for a circumstantial-evidence instruction because the video was not direct evidence. "This Court reviews a grant or denial of jury instructions for abuse of discretion." *Moore v. State*, 247 So. 3d 1198, 1201 (¶14) (Miss. 2018) (citing *McInnis v. State*, 61 So. 3d 872, 875 (¶10) (Miss. 2011)). Additionally, jury instructions "must be read as a whole to determine whether they fairly announce the law, and they must be supported by evidence." *Id*.

¶35. "Where all the evidence tending to prove the guilt of the defendant is circumstantial, the trial court must grant a jury instruction that every reasonable hypothesis other than that of guilt must be excluded in order to convict." *Kirkwood v. State*, 52 So. 3d 1184, 1186 (¶10) (Miss. 2011) (quoting *Manning v. State*, 735 So. 2d 323, 338 (¶25) (Miss. 1999)). Here, the circuit court determined the surveillance video amounted to direct evidence, so it denied the following two circumstantial-evidence instructions submitted by Beasley. Proposed instruction D-11 stated:

> The Court instructs the jury that if there are two plausible theories arising out of the evidence in this case, and one tends to prove that Javondus Beasley killed Eldra Gibson, Ashley Taylor, and Sharrod Brown, and another tends to prove that some other person or persons killed Eldra Gibson, Ashley Taylor, and Sharrod Brown, and if the jury is unable to determine from the evidence which of the two theories is true, the jury must accept that theory most favorable for Javondus Beasley and find him not guilty.

Proposed instruction D-12 stated:

> The Court instructs the jury that if there is a fact or circumstance in this case susceptible to two interpretations, one favorable and the other unfavorable to Javondus Beasley, and when the jury has considered said fact or circumstance with all other evidence, and there is a reasonable doubt as to the correct interpretation, then you, the jury, must resolve such doubt in favor of Javondus Beasley, and place upon such fact or circumstance the interpretation most

17

favorable to Javondus Beasley.

> The Court instructs the jury that if you can reconcile the evidence upon any reasonable hypothesis consistent with Javondus Beasley's innocence, you should do so and find him not guilty.

¶36.   In *Moore*, our supreme court decided 5-3[8] that the failure to grant the defendant's request for a circumstantial-evidence instruction was reversible error. *Moore*, 247 So. 3d at 1205 (¶31).   Moore was convicted of second-degree murder for shooting and killing the victim. *Id*. at 1198 (¶1).   At trial, the State presented video surveillance showing Moore's car pulling behind the victim's vehicle. *Id*. at 1199 (¶3).   The footage also showed that Moore exited his vehicle and approached the driver's side of the victim's vehicle. *Id*.   Moore talked with the victim and then got back in his vehicle and drove west through the parking lot. *Id*.   As he was driving, Moore briefly stopped his vehicle. *Id*. at (¶4).   As the victim exited the parking lot in his vehicle, Moore followed. *Id*.   The next piece of surveillance footage showed the vehicle of the victim, who at some point had been shot, go through an intersection, over a curb, and down an embankment. *Id*. at (¶¶6-7).   No footage showed Moore shooting the victim. *Id*.   Moore requested a circumstantial-evidence instruction, which the court refused. *Id*. at 1201 (¶13).   Our supreme court reversed Moore's conviction, but, in doing so, added a harmless-error analysis to our appellate review:

> Circumstantial evidence instructions exist to ensure that, in cases in which the prosecution is without either a confession from the defendant or an eyewitness to the gravamen of the offense charged, a fair trial is had. *A set of facts could arise in which this Court finds the trial court's failure to give a circumstantial evidence jury instruction in a circumstantial evidence case to have been harmless error.* But today's case does not present such a fact pattern and we

---

[8] Justice Chamberlin recused.

decline to speculate about a hypothetical scenario.

*Id*. at (¶26) (emphasis added).

¶37.    I would find that the present case exemplifies a "set of facts" that warrants a harmless-error analysis of the court's failure to give a circumstantial-evidence instruction.  Here, the video footage shows Beasley approaching the house at 10:48 p.m.  There is no doubt that the man approaching the house is Beasley.  Shortly after, a man inside the home opens the door for Beasley, and Beasley enters.  Beasley is seen exiting the home at 11:40 p.m., with his hoodie over his head, carrying a plastic bag that he did not enter the residence carrying.  As shown by the footage, no one else entered the home until the next day at 10:24 a.m., when Barbara Taylor went to check on her sister, Ashley.  Barbara found Ashley, Brown, and Gibson deceased.  Additionally, the side door to the house was secured by a nail, so the only entry to the house was the front door—where Beasley entered and exited and no one else entered or exited until the bodies were discovered.[9]  In fact, the front door never opened again during the almost eleven hours from when Beasley left the home and the time the bodies were discovered the next day.

¶38.    The murder weapon was never found. Two of the three shell casings[10] were also never

---

[9] On direct examination, Sergeant Buffkin was asked if there were any visible signs of forced entry into the side door.  His response was, "No.  The rusted nail was there and looked like it's been there for a while.  It was undisturbed."  He was then asked how the perpetrator entered the house.  He responded, "It appears the only entry, exit, would be through the front door."  Sergeant Buffkin's testimony is sufficient to exclude any other reasonable theory other than Beasley committing the crimes.

[10] Three victims were each shot once in the head, meaning three shots had to be fired, yet only one shell casing was found.

19

found. Shell casings and guns do not have legs. If the gun and two shell casings were not in the house, the only plausible explanation is that the shooter took them in an effort to lower the potential evidence available to be discovered by law enforcement. Under these facts, there are only two possible explanations as to how three individuals were killed in the same house. First, one person inside the house shot two victims and then shot and killed himself or herself. Second, Beasley, the only person seen entering when the victims were alive and leaving before they were found dead, shot and killed all three victims. Since guns and shell casings cannot walk away from a crime scene and the person who shot himself after killing two people would be physically incapable of hiding the evidence, there is only one "reasonable hypothesis" that is consistent with the video and the evidence at the scene—Beasley shot and killed all three victims. Beasley was seen entering the home empty handed and leaving the home carrying something he did not enter the home carrying. He was the only person who entered while the occupants were alive (it is seen on video that someone opened the door for Beasley). After Beasley left, no one else entered until the bodies were discovered the following day. All of the evidence and the only reasonable interpretation ascribed thereto points directly to and only to Beasley.

¶39. In *Holland v. United States.* 348 U.S. 121, 140 (1954), "the United States Supreme Court . . . rejected the notion that a circumstantial-evidence instruction must be given in any criminal case lacking direct evidence." *Burleson v. State*, 166 So. 3d 499, 515 (¶51) (Miss. 2015) (Pierce, J., dissenting). The Supreme Court ultimately held that "the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional

20

instruction on circumstantial evidence is confusing and incorrect . . . ." *Holland*, 348 U.S. at 139-40. Justice Robertson expanded on *Holland*'s holding in his concurring opinion in *Mack v. State*, 481 So. 2d 793, 797 (Miss. 1985) (Robertson, J., concurring):

> Upon reflection it seems that the circumstantial evidence instruction and the many battles this Court has fought regarding when it should be given may in reality be much ado about nothing. If an accused's guilt is established to the exclusion of every reasonable hypothesis consistent with innocence, then it may be said that he has been found guilty beyond a reasonable doubt. Conversely, if the evidence has not excluded from the juror's mind a reasonable hypothesis consistent with innocence, it follows that the State has not established guilt beyond a reasonable doubt. After all, what—and all—that is constitutionally required is that the accused's guilt be established beyond a reasonable doubt, *period*.

(Citing *Jackson v. Virginia*, 443 U.S. 307, 315 (1979)).

¶40.    In his *Moore* dissent, Justice Maxwell found that the court's failure to grant a circumstantial-evidence instruction was, at most, harmless error due to the overwhelming weight of the evidence. *Moore*, 247 So. 3d at 1210-11 (¶¶52-56). He further found that a separate circumstantial-evidence instruction was not required because the jury was instructed to find each and every essential element of the crime charged beyond a reasonable doubt. *Id*. The dissent by Justice Maxwell and joined by two other justices makes it clear that all federal courts and a majority of other state courts are moving away from the requirement of confusing circumstantial-evidence instructions. Rather, courts are finding that the long-standing and constitutionally required safe harbor of ensuring that the jury understands and finds each element of the crime charged "beyond a reasonable doubt" is sufficient. *Id*. at 1211 (¶58); *see also Burleson*, 166 So. 3d at 515-16 (¶52) (Pierce, J., dissenting). As "long as the court instructs the jury on the necessity that the defendant's guilt be established beyond

21

a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Burleson*, 166 So. 3d at 517 (¶57) (Pierce, J., dissenting) (quoting *Victor v. Nebraska*, 511 U.S. 1, 5 (1994)). The United States Supreme Court has held that "'[a] defendant is entitled to a fair trial but not a perfect one,' for there are no perfect trials." *Brown v. United States*, 411 U.S. 223, 231-32 (1973) (quoting *Bruton v. United States*, 391 U.S. 123, 135 (1968)). "Any lawyer who has ever tried a jury trial, and any judge who has ever presided over one, will agree with this notion. That is why this Court refuses to 'set[] aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial.'" *Moore*, 247 So. 3d at 1208 (¶46) (Maxwell, J., dissenting) (quoting *Smith v. State*, 136 So. 3d 424, 435 (¶27) (Miss. 2014)).

¶41.    Under the current state of our law, since no one survived to tell of Beasley's crimes, no other witness saw his crimes, and Beasley denied his guilt, the defense asked for a circumstantial-evidence jury instruction, which was denied. Because Beasley should have received a circumstantial-evidence instruction under our present supreme court precedent,[11] the court's failure to give one amounts to error. However, pursuant to *Moore*, that is no longer the end of our analysis. *Moore*, 247 So. 3d at 1204 (¶26). The jury was instructed that in order to find Beasley guilty, it must find each element listed within the capital-murder elements instructions beyond a reasonable doubt. The jury saw the video showing only

---

[11] There may come a day, in accordance with many other courts and Justice Maxwell's well-reasoned dissent in *Moore* and Justice Pierce's dissent in *Burleson*, that circumstantial-evidence instructions are no longer required when the jury is instructed properly about the constitutionally required finding that the State prove each element of the crime charged with proof beyond a reasonable doubt.

Beasley entering when the victims were alive and exiting the only available door. No one else was seen entering the house until the victims were discovered. The gun that killed all three victims was not found at the scene.[12] The two shell casings that housed the projectiles that killed two of the three victims were not found at the scene. Beasley is seen leaving the residence with items in a bag that he did not have when he entered. The theory of someone other than Beasley committing the crimes is impossible to countenance.

¶42. The jury was properly instructed on the defendant's presumption of innocence and the State's burden of proof beyond a reasonable doubt; it was informed "not to single out one instruction alone as stating the law, but [that it] must consider [the] instructions as a whole." Further, while circumstantial, the evidence of guilt was overwhelming and offered only one reasonable interpretation. The proposed circumstantial-evidence jury instructions would not have altered the only reasonable interpretation any reasonable juror could have—that Beasley committed the crimes in question. Therefore, I would find that the error of not giving the circumstantial-evidence jury instruction was harmless and affirm Beasley's convictions.

**CARLTON, P.J., AND TINDELL, J., JOIN THIS OPINION.**

---

[12] The lack of the gun and two shell casings eliminates the only possibility (murder and suicide) when viewed with the video showing only Beasley entering and exiting the home.



