# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-01849-COA

JIMMY CARPENTER A/K/A JIMMY DEAN CARPENTER

APPELLANT

v.

STATE OF MISSISSIPPI

APPELLEE

DATE OF JUDGMENT:                    11/22/2019
TRIAL JUDGE:                         HON. KELLY LEE MIMS
COURT FROM WHICH APPEALED:           ITAWAMBA COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:              OFFICE OF STATE PUBLIC DEFENDER
                                     BY: JUSTIN TAYLOR COOK
ATTORNEY FOR APPELLEE:               OFFICE OF THE ATTORNEY GENERAL
                                     BY: META S. COPELAND
DISTRICT ATTORNEY                    JOHN DAVID WEDDLE
NATURE OF THE CASE:                  CRIMINAL - FELONY
DISPOSITION:                         AFFIRMED - 02/22/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE WILSON, P.J., GREENLEE AND McDONALD, JJ.

### McDONALD, J., FOR THE COURT:

¶1.     On November 22, 2019, an Itawamba County Circuit Court jury found Jimmy Dean Carpenter guilty of the first-degree murder of Sharon Johnson, an elderly woman who employed Carpenter as her caretaker. The circuit court sentenced Carpenter as a habitual offender to life imprisonment without eligibility for parole in the custody of the Mississippi Department of Corrections (MDOC). Carpenter moved for a directed verdict at the close of the State's case-in-chief, which the court denied. He did not renew the motion, nor did he file any post-trial motions regarding a challenge to the sufficiency of the evidence, which is

Carpenter's sole issue on appeal. Therefore, Carpenter waived the sufficiency-of-the-evidence issue for appellate review. Notwithstanding the waiver, we find that there was sufficient evidence presented to support the guilty verdict and affirm his conviction and sentence.

**Statement of the Facts and Procedural History**

¶2. Sharon Johnson was a sixty-six-year-old disabled woman who often needed assistance from her friends for day-to-day tasks.[1] Daniel Reich, a friend of Sharon's, checked on her weekly and took her to doctor appointments. After Sharon had abdominal surgery, she required even more help. Daniel suggested that Sharon hire a caretaker and introduced her to Jimmy Dean Carpenter. Sharon hired Carpenter as her live-in caretaker in June 2015. Carpenter's job included changing Sharon's bandages and helping with the upkeep of her house. Instead of paying Carpenter, Sharon gave him room and board because he had nowhere else to live.

¶3. According to Daniel, the arrangement was going well until Carpenter would not allow him to talk to Sharon when Daniel called to check on her. Then, Sharon updated her will to leave her house, land, and furniture to Carpenter if he would take care of her until her death.

¶4. On the morning of August 27, 2015, Elizabeth Taylor, another friend, arrived at Sharon's house to take Sharon to the doctor because neither Sharon nor Carpenter owned a vehicle. Upon her arrival, Elizabeth heard yelling from inside Sharon's house. Elizabeth

---

[1] Sharon had one son and one daughter. Sharon's daughter passed away seven years prior to Sharon's murder. At the time of Sharon's death, she had an estranged relationship with her son, whom she had not seen or communicated with in the two years prior to her death.

continuously knocked on Sharon's door until Sharon opened the door. Sharon told Elizabeth that Carpenter had had a "bad night." When Sharon let Elizabeth into the house, Elizabeth heard Carpenter say from the back of the house, "Don't touch me. Leave me alone. I don't want you around me."[2] Elizabeth took Sharon to the doctor, and both women returned to Sharon's house around 1:30 p.m. After Elizabeth packed Sharon's bandages, she left Sharon's house at 4:30 p.m. When Elizabeth left, Sharon was on her recliner, and Carpenter was in the kitchen making a cup of tea.

¶5. Later that evening, after receiving an alert from Sharon's Safe Home Security alarm system, the security company called 911. Shortly thereafter, officers from the Itawamba County Sheriff's Department arrived at Sharon's home. When the officers entered through the unlocked front door, they found Sharon stabbed to death in her recliner in the living room.[3]

¶6. More sheriff's department officers arrived at the scene of the crime, including Officer Tyler Gordon and Officer Larry Johnson. The officers began searching Sharon's house and the area around the house. When Officer Gordon inspected the storage shed behind the house, he heard a male voice coming from the woods, yelling, "Lord, forgive me," and repeatedly asking, "Why?" Officer Johnson also heard the voice saying, "God, forgive me

---

[2] Elizabeth had seen Carpenter act in a similar manner once before. During a card game between Sharon, Carpenter, and herself, Carpenter began shouting, "Don't touch me."

[3] Dr. Mark LeVaughn, chief medical examiner for the State of Mississippi, found that Sharon suffered stab and slash wounds to her neck, chest, and shoulder, including defensive wounds to her hands. Sharon's death resulted from multiple sharp-force injuries from a single-edge blade. The manner of death was ruled a homicide.

for what I did." Both officers followed the voice into the woods but were unable to find anyone. Officer Gordon then retrieved his K9 dog that located Carpenter in the woods about twenty to thirty feet from Sharon's house.

¶7. When the officers tried to arrest Carpenter, he kicked and hit the officers, did not lie on the ground when instructed, and refused to be handcuffed. After the officers gave Carpenter verbal warnings, they used the K9 dog and tasers to subdue him. When Carpenter was yelling during his arrest, the officers believed that it was the same voice that they had previously heard in the woods.

¶8. Carpenter was arrested and transported to the Itawamba County jail. The police interviewed Carpenter on August 30, 2015, three days after the murder. During the interview, he denied knowing Sharon. Additionally, Carpenter claimed that he did not know where he lived or worked.

¶9. The officers recovered several items from the scene that they sent to the Mississippi Forensics Laboratory. A knife that was recovered from the kitchen tested positive for Sharon's DNA, and Carpenter's right palm print was found on the knife's handle. Carpenter's DNA was found on a bloody ice cream package lid and on a spoon in the kitchen sink. Significantly, blood found on Carpenter's blue jeans and boots at the time of his arrest tested positive for Sharon's DNA. The officers also recovered Sharon's personal security device that hung around her neck so she could activate it in an emergency. The personal device triggered Sharon's Safe Home Security system and captured an audio recording of the

4

events.[4]  Despite the static in the background, Carpenter's voice was on the recording, repeatedly stating that "everything is okay."

¶10.    On February 12, 2016, an Itawamba County grand jury indicted Carpenter for one count of first-degree murder pursuant to Mississippi Code Annotated section 97-3-19(l)(a) (Rev. 2014).[5]  The indictment included an enhanced penalty pursuant to Mississippi Code Annotated sections 99-19-351 through 99-19-357,[6] which provide for an enhancement if the victim is sixty-five years of age or older or disabled.  Sharon was both sixty-six and disabled at the time of her death.  During arraignment, on February 25, 2016, Carpenter pled not guilty to the first-degree murder charge and was held in jail on a $1,000,000 bond.

¶11.    The circuit court granted Carpenter's motion for a psychiatric examination[7] on October 24, 2016, to determine (1) whether he was unable to comprehend the nature of the charges against him and rationally aid in his defense; (2) whether at the time of the

---

[4] During a pre-trial motions hearing, the State's counsel, Raymond O'Neal III, described the procedure.  The Safe Home Security button was pressed during the crime.  The company then takes recordings of the calls and uses them to call 911.

[5] Mississippi Code Annotated section 97-3-19(1)(a) defines first-degree murder as the following: "The killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with deliberate design to effect the death of the person killed, or of any human being . . . ."

[6] Mississippi Code Annotated section 99-19-355 (Rev. 2015) provides that "[i]n order to impose an enhanced penalty under the provisions of Sections 99-19-351 through 99-19-357, the jury must find beyond a reasonable doubt: (a) [t]hat the defendant perceived, knew, or had reasonable grounds to know or perceive that the victim was within the class delineated; and [t]hat the defendant maliciously and with specific intent committed the offense to any victim who is sixty-five (65) years of age or older or who is disabled as described in 42 USCS 12102."

[7] The motion is not in the record.

commission of the crime charged he was of such mental capacity to distinguish between right and wrong; and (3) whether at the time statements or confessions were made to law enforcement officers he was competent to understand his rights.[8]

¶12. On January 18, 2018, the State moved to amend Carpenter's indictment to add an habitual offender charge pursuant to Mississippi Code Annotated section 99-19-83 (Rev. 2015)[9] based on the following two crimes: (1) on May 14, 2002, Carpenter was convicted in the Tippah County Circuit Court on a charge of burglary of a dwelling and was sentenced to serve a term of twenty years in the MDOC's custody with seven of those years suspended; and (2) on July 7, 2006, Carpenter was convicted in the Montgomery County Circuit Court in Tennessee on charges of aggravated kidnapping and robbery and was sentenced to serve a term of ten years in the custody of the Tennessee Department of Corrections. The court granted the State's motion the same day.

¶13. On January 18, 2018, Carpenter moved for leave to hire a forensic media expert for

---

[8] Due to administrative errors, the court amended the order on May 22, 2017, to properly name Carpenter as the defendant, to change the location of Carpenter's evaluation from the Mississippi State Hospital to the offices of Dr. Criss Lott, and to have the report sent to Carpenter's counsel.

[9] "Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to and served separate terms of one (1) year or more, whether served concurrently or not, in any state and/or federal penal institution, whether in this state or elsewhere, and where any one (1) of such felonies shall have been a crime of violence, as defined by Section 97-3-2, shall be sentenced to life imprisonment, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole, probation or any other form of early release from actual physical custody within the Department of Corrections." Miss. Code Ann. § 99-19-83 (Rev. 2015).

the purpose of enhancing and/or filtering the Safe Home Security's audio recording. The court granted Carpenter's motion on May 23, 2018.

¶14. Carpenter filed several letters in the circuit court, starting on July 18, 2018, stating that he refused legal representation because the public defender was a liar, called him the wrong names, and discussed his case with other people. Carpenter also believed that his counsel was conspiring with authorities in jail to frame him and that authorities were coercing inmates to provide false testimony against him. During a pre-trial hearing, Carpenter asked the court to remove his attorney from his case, which the court denied. The court found that it was critical to Carpenter's trial that he had someone who could explain the court's rulings and give him ideas.

¶15. The circuit court held Carpenter's competency hearing on April 17, 2019. Carpenter stipulated to Dr. Lott's report dated August 23, 2017, so Dr. Lott was not called to testify in the hearing. According to Dr. Lott's report, Carpenter, to a reasonable degree of psychological certainty, had sufficient present ability to confer with his attorney with a reasonable degree of rational understanding. Carpenter also had a factual and rational understanding of the nature and object of the legal proceedings against him. Additionally, Dr. Lott's report stated that Carpenter was not suffering from a severe mental illness at the time of the offense and that he would have had the ability to know the nature and quality of his actions and the ability to know the difference between right and wrong in relation to his actions at the time. The court found that Carpenter was competent to assist his attorney and stand trial.

¶16.    Carpenter filed a motion to prevent the State from eliciting testimony of his character, past felony convictions, crimes, wrongs, or other acts pursuant to Mississippi Rule of Evidence 404(b) on June 26, 2019.  The court granted Carpenter's motion that no prior criminal history would be allowed at trial unless for impeachment purposes.

¶17.    The court held a pre-trial hearing on other motions on August 6, 2019.  The court allowed Carpenter to proceed pro se, but the defense counsel assisted him when necessary.  Although the motion is not in the record, the court denied Carpenter's motion to change venue, finding that he had not met his burden of showing that the venue had been compromised.  Carpenter also made a second request to remove his attorney from his case, which the court denied.

¶18.    The trial took place on November 18, 2019, through November 22, 2019.[10]  The State presented several witnesses, including Elizabeth Taylor, Investigator Tyler Gordon, Investigator Larry Johnson, and Dr. Mark LeVaughn.  After the State rested, Carpenter moved for a directed verdict on the ground that the State failed to make a prima facie case against him.  The court denied Carpenter's motion.

¶19.    The defense called several witnesses.  Craig Rogers, Sharon's friend, testified that Sharon complained about people stealing from her.  Additionally, Craig stated that Sharon wanted Carpenter at her house for protection and that he (Craig) never had the impression that Carpenter was violent toward Sharon.  Daniel Reich testified that Sharon complained about people stealing and breaking into her house.  Investigator Jimmy Sartin testified that

---

[10] Carpenter served as co-counsel at trial, assisting his defense counsel in the matter.

Sharon had called him to her house and stated that she had a fear that people would break into her house.

¶20.    Carpenter's sister, Rena Hayes, testified that on January 22, 2016, she visited Carpenter in the Itawamba County jail.  After she spoke to Carpenter for about ten minutes, she spoke to Investigator Mike Newlin from the Itawamba County Sheriff's Department.  He asked Rena to listen to the Safe Home Security's audio recording.  She identified that it was Carpenter's voice on the tape.  The State then played the audio recording for the jury, and Rena once again verified that it was Carpenter's voice on the recording.

¶21.    Carpenter attempted to show that law enforcement was conspiring against him and coercing inmates to provide false testimony against him.  Carpenter's counsel called six current and former inmates, but all denied that law enforcement had threatened or coerced them into making a false statement against Carpenter.

¶22.    Carpenter then took the stand.  Carpenter testified that he and Sharon were friends. Further, Carpenter testified that although he was in the house on the day that Sharon was murdered, he was not in the house at the time the murder occurred.  Carpenter claimed that he heard a "bump" near the back of the house.  He then claimed that there were two men in Sharon's yard.  He chased one of the men into the woods behind Sharon's home.  Carpenter testified that he remained in the woods until the police arrived.  He also stated that the voice that the police heard before getting the K9 dog was from the man who he chased into the woods.  Carpenter admitted that he never told police about the two men who he claimed to have seen that night.  He testified that he did not see the men in the woods.  Carpenter also

9

admitted that he had no proof to support the claim that the two men had murdered Sharon. In fact, on cross-examination, the State asked Carpenter who he thought murdered Sharon, and he responded that he did not know.[11]

¶23.    Additionally, although Carpenter testified that he and Sharon were friends, he claimed that Sharon was a pill dealer who lived in a dangerous and crime-filled community. Carpenter told the jury that Sharon had been selling her prescription pain medicine and kept thousands of dollars hidden in her home.  Both the defense and the State rested.

¶24.    The jury found Carpenter guilty of first-degree murder on November 22, 2019.  The circuit court sentenced Carpenter as a habitual offender to life imprisonment without eligibility for parole in the custody of the MDOC.[12]  Carpenter did not renew his motion for a directed verdict, nor did he make any post-trial motions challenging the sufficiency of the evidence.

¶25.    On December 18, 2019, Carpenter appealed, raising the sole issue of whether the State presented sufficient evidence to support his conviction.

**Standard of Review**

¶26.    The standard of review for a trial court's ruling on the legal sufficiency of the

---

[11] Carpenter believed that one of the men was John Buckley but admitted at trial that he had no proof to support this assumption. During discovery, Matthew Gasaway was believed to be the man who ran into the woods.  Initially, Carpenter was going to present witnesses to testify that Matthew confessed to Sharon's death.  But no witnesses testified to this claim.  Further, when asked about Matthew at trial, Investigator Mike Newlin testified that Matthew was in jail when 911 received the alert from Sharon's alarm company.

[12] During Carpenter's sentencing, the State dropped its request for an age-enhanced penalty.

10

evidence is de novo. *Reindollar v. State*, 296 So. 3d 739, 742 (¶11) (Miss. Ct. App. 2020).

"In considering whether the evidence is legally sufficient to sustain a conviction, 'the critical inquiry is whether the evidence shows beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed.'" *Thompson v. State*, 269 So. 3d 301, 308 (¶17) (Miss. Ct. App. 2018) (quoting *Russell v. State*, 924 So. 2d 604, 608 (¶8) (Miss. Ct. App. 2006)). "When we address a challenge to the sufficiency of the evidence, all credible evidence of guilt must be taken as true, and the State is entitled to all reasonable inferences that may be drawn therefrom." *Allen v. State*, 299 So. 3d 917, 925 (¶25) (Miss. Ct. App. 2020) (quoting *Haynes v. State*, 250 So. 3d 1241, 1244 (¶6) (Miss. 2018)). "Circumstantial evidence is 'evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact does exist.'" *Shelton v. State*, 214 So. 3d 250, 258 (¶40) (Miss. 2017) (quoting *McInnis v. State*, 61 So. 3d 872, 875 (¶11) (Miss. 2011)).

**Discussion**

¶27.    Carpenter argues that the State failed to present sufficient evidence to support his murder conviction because there was no direct evidence, and the State had to prove his guilt to the exclusion of every reasonable hypothesis consistent with his innocence. We agree with this legal principle but find the evidence the State presented was sufficient to meet its burden.

¶28.    "The sufficiency of the evidence is challenged with a motion for a directed verdict, a request for a peremptory instruction, or a motion for judgment notwithstanding the verdict (JNOV)." *Pace v. State*, 242 So. 3d 107, 117 (¶24) (Miss. 2018) (citing *McClain v. State*,

625 So. 2d 774, 778 (Miss. 1993)). "When the defendant proceeds with his case after the State rests and the court overrules the defendant's motion for a directed verdict, the defendant has waived the appeal of that directed verdict." *Id*. at (¶25) (quoting *Holland v. State*, 656 So. 2d 1192, 1197 (Miss. 1995)). To preserve an issue for appeal if the defense presents witnesses or other evidence, the defendant must renew his motion for a directed verdict when he rests. *Goldsmith v. State*, 195 So. 3d 207, 212 (¶13) (Miss. Ct. App. 2016) (citing *Page v. State*, 990 So. 2d 760, 761 (¶9) (Miss. 2008)). "Stated another way, if a defendant put on evidence in his own defense after the denial of his motion for directed verdict, he waives his challenge to the sufficiency of the State's evidence up to that point." *Washington v. State*, 298 So. 3d 430, 439 (¶29) (Miss. Ct. App. 2020) (quoting *Woods v. State*, 242 So. 3d 47, 54 (¶24) (Miss. 2018)). "In the absence of a renewal of the directed verdict, a request for a peremptory instruction, or a motion for a judgment notwithstanding the verdict, the defendant has waived the sufficiency error on appeal." *Pace*, 242 So. 3d at 117 (¶24).

¶29. Like the defendant in *Pace*, Carpenter failed to renew his motion for a directed verdict, request a peremptory instruction, or move for judgment notwithstanding the verdict. Therefore, Carpenter waived his sufficiency-of-the-evidence issue on appeal.

¶30. Notwithstanding the waiver, we find that the State presented sufficient evidence to support Carpenter's conviction. "When reviewing the sufficiency of the evidence, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

12

beyond a reasonable doubt." *Jones v. State*, 257 So. 3d 285, 290 (¶13) (Miss. Ct. App. 2020), *cert. denied*, 256 So. 3d 595 (Miss. 2018) (quoting *Magee v. State*, 231 So. 3d 243, 249 (¶14) (Miss. Ct. App. 2017)). "Where the facts and inferences 'point in favor of the defendant on any element of the offense with sufficient force that reasonable jurors could not have found beyond a reasonable doubt that the defendant was guilty, the proper remedy is . . . to reverse and render.'" *Dean v. State*, 295 So. 3d 575, 578 (¶8) (Miss. Ct. App. 2020) (quoting *Williams v. State*, 35 So. 3d 480, 485 (¶16) (Miss. 2010)).

¶31.    "Circumstantial evidence is defined as 'evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact does exist.'" *Turner v. State*, 291 So. 3d 376, 381 (¶13) (Miss. Ct. App. 2020) (quoting *Shelton*, 214 So. 3d at 258 (¶40)).

¶32.    Mississippi Code Annotated section 97-3-19(1)(a) defines first-degree murder as the following: "The killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with deliberate design to effect the death of the person killed, or of any human being . . . ." In order to prove Carpenter committed murder, the evidence must show that Carpenter: (1) killed Sharon (2) without authority of law but with (3) the deliberate design to effect her death.

¶33.    In this case at bar, the court properly instructed the jury on the elements of first-degree murder:

Jury Instruction S-2

The Defendant, Jimmy Dean Carpenter, has been charged by Indictment with the crime of murder of Sharon Rose Johnson. If you find from the evidence

13

in this case beyond a reasonable doubt that: 1. On or about the 27th day of August, 2015 in Itawamba County, Mississippi; 2. Sharon Rose Johnson was a human being; and 3. That Jimmy Dean Carpenter without authority of law did willfully and with malice aforethought kill Sharon Rose Johnson by slashing, cutting, and/or stabbing her with a knife with deliberate design to effect the death of Sharon Rose Johnson; Then you shall find the Defendant, Jimmy Dean Carpenter, guilty of the murder of Sharon Rose Johnson. If the prosecution has failed to prove any one or more of the above listed elements beyond a reasonable doubt, then you shall find the Defendant, Jimmy Dean Carpenter, not guilty of the murder of Sharon Rose Johnson.

The court also instructed the jury on the meaning of "deliberate design:"

Jury Instruction S-3

Deliberate design means intent to kill, without authority of law and not being legally justifiable, legally excusable or under circumstances that would reduce the act to a lesser crime. "Deliberate" always indicates full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences. "Design" means to calculate, plan, or contemplate. "Deliberate design" to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent. "Deliberate design" and "malice aforethought" have the same meaning.

Additionally, the court properly instructed the jury on circumstantial evidence:

Jury Instruction No. 3:

If the State has used circumstantial evidence to prove its case against the defendant, then the evidence must be so strong as to convince you that the defendant is guilty beyond a reasonable doubt and to the exclusion of any reasonable explanation of the defendant's innocence.

¶34. Here, accepting all the evidence in the light most favorable to the State, we find that the evidence was sufficient for the jury to find that Carpenter killed Sharon with deliberate design and without authority of law. Shortly after the officers arrived at the scene of the crime, Carpenter was found hidden in the woods behind Sharon's house. While Carpenter testified that he chased a man into the woods that night, no one but Carpenter was found in

14

the woods. Carpenter's DNA was found on a bloody ice cream package lid and on a spoon in the kitchen sink. Most significantly, although Carpenter testified that he was not in Sharon's house when she was murdered, Sharon's blood was found on Carpenter's pants and boots. Additionally, both Officer Gordon and Officer Johnson testified at trial that when they were inspecting the area behind Sharon's house, they heard a voice in the woods asking God for forgiveness. Both officers opined that it was Carpenter's voice that they heard.

¶35. Furthermore, Carpenter contradicted himself concerning even knowing Sharon. During his interview with the police following his arrest, he denied even knowing Sharon, let alone working as her caretaker. But at trial, he described Sharon as his friend who was selling prescription drugs out of her house, which made her a target for robberies. Investigator Sartin testified that there was no evidence that anyone had broken into Sharon's house. Elizabeth testified that Sharon's neighbors used drugs, but no one had ever broken into Sharon's house.

¶36. Moreover, after twice listening to the Safe Home Security's audio recording that recorded the sounds of Sharon's murder, Carpenter's sister Rena verified both times that it was Carpenter's voice on the recording.

¶37. Notwithstanding the waiver of the issue, after reviewing the evidence in the "light most favorable to the prosecution," we find that a rational trier of fact in this case could have found the essential elements of the crime beyond a reasonable doubt and that Carpenter was guilty of first-degree murder. Accordingly, Carpenter's claim that the evidence was insufficient is without merit.

## Conclusion

¶38. Because Carpenter did not properly preserve his sufficiency of the evidence challenge on appeal, the issue is waived. Notwithstanding the waiver, we find that the State presented sufficient evidence at trial, and we affirm his conviction and sentence.

¶39. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR.**