# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00341-COA

**SHERARD EUGENE WARD A/K/A SHERARD E. WARD A/K/A SHERRARD WARD**                    APPELLANT

v.

**STATE OF MISSISSIPPI**                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 07/19/2023 |
| TRIAL JUDGE: | HON. GRADY FRANKLIN TOLLISON III |
| COURT FROM WHICH APPEALED | LAFAYETTE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | MARK KEVIN HORAN |
| | BRADLEY DAVID DAIGNEAULT |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ABBIE EASON KOONCE |
| DISTRICT ATTORNEY: | BENJAMIN F. CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 11/04/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., EMFINGER AND WEDDLE, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.      Sherard Ward was found guilty in the Circuit Court of Lafayette County, Mississippi, of voyeurism as charged in Count I of his indictment and first-degree murder as charged in Count II.  Ward was sentenced to serve five years in the custody of the Mississippi Department of Corrections for Count I and life imprisonment for Count II.  He appeals his convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

¶2.      Ward and his wife, Marisha Danielle "Danny" Golden, lived in a neighborhood in

Lafayette County that was comprised of multiple duplexes on County Road 1080. Rachel and Jody Todd, sisters and college students, lived in a duplex alongside Ward and Golden. According to both Rachel and Jody, Ward would often make them feel uncomfortable by staring at them when they were coming and going from their home, looking in their windows, and making inappropriate sexual comments and advances to them and their friends. According to Jody, Ward told her on one occasion that he wanted to "hook up" and that she would need to keep it a secret. Jody testified that after this incident, she felt anxious and became concerned about going in and out of the house by herself, especially at night.

¶3. On Friday afternoon, August 28, 2020, Ward knocked on the sisters' door. When Jody answered the door, Ward told her that "he was going to be outside that night." Not understanding Ward's comment, Jody shut the door. Ward knocked again and this time told Jody that "he wasn't trying to be an ass," but he just wanted to let her know "that he was going to be outside." Jody testified that around 11:00 p.m. that same night, when she was getting ready for bed, she heard Ward's voice "loud and audible" outside her bedroom window. Jody claimed that she immediately unplugged some string lights that were on in her room. When her lights were turned off, she stated that she could see Ward's silhouette walk past her window. According to Jody, Ward was only a "couple of feet" from her window, between her car and the bushes outside the window. According to trial testimony, there would have been no reason for anyone to be in the small space near that particular duplex window. After debating what to do next, the sisters ultimately decided to remain in the house for the night; however, both Rachel and Jody slept in Rachel's room. The sisters left the next

morning to go out of town, but Rachel called their landlord, Summit Management, on the following Monday, August 31 to report Ward's actions. After reporting the incident to their landlord, the girls also reported the incident to the police.

¶4.     That same day, August 31, 2020, Deputy Kayla Shoffner was dispatched to respond to the call from Rachael's report of voyeurism that occurred on August 28. Based on the report Rachel made, Shoffner met with Ward to question him about the incident. Shoffner testified that during the interview, Ward stated that he would leave the Todd sisters alone. Shoffner indicated that Golden was present during a portion of her initial interview with Ward. After Shoffner left Ward's home, she received another call from dispatch stating that Ward had called and wanted to speak to Shoffner again. When Shoffner called Ward, he told Shoffner that he wished to speak over the phone when his wife was not present. During their second conversation, Ward admitted that he "messed up" and was going to get help. According to Shoffner, on September 1 she received a "walk in complaint" from Jody concerning the voyeurism that occurred on August 28. Shoffner indicated that all the information received as a result of her interviews was passed along to Investigator Nathan Noe as the charging officer.

¶5.     On September 2, 2020, Investigator Noe conducted a follow-up investigation on the reported voyeurism incident that occurred on August 28. The Todd sisters advised Noe that they wished to press charges. On that same day, a warrant was issued, and Ward was arrested in front of his home. At the time Ward was arrested, Noe observed a loaded handgun in Ward's car. After Noe verified that the gun was not stolen, he unloaded the

handgun and placed it on a coffee table inside Ward's home. A patrol deputy arrived on the scene shortly thereafter and transported Ward to the Lafayette County Detention Center.

¶6. On the following day, September 3, 2020, Noe met with Ward at the jail. After waiving his *Miranda*[1] rights, Ward agreed to speak with Noe about his arrest and the voyeurism charge. According to Noe, Ward admitted to looking through Rachel and Jody's window three or four times, but he said that one of the sisters was in the bedroom only one time. Ward also told Noe that he only looked in their window when his wife was out of town. Ward admitted again, this time to Noe, that he had a "sexual problem" and needed help.

¶7. Later that day, Golden came to the sheriff's department to find out details regarding Ward's charges and to find out if he would have to post a bond to be released from custody. Noe testified that he spoke to Golden and explained the Todd sisters' report and why Ward was arrested. According to Noe, Golden then asked him to explain what had happened to Ward's parents (Eddie and Emma Ward), who were also with her at the sheriff's department. Noe explained the circumstances around Ward's arrest to Eddie and Emma Ward. During Noe's conversation with Golden, Eddie, and Emma, Noe advised them that it would probably be wise to remove Ward's firearm from the house. Ward's parents assured Noe that they would remove his guns. Considering the nature of Ward's charge and his admission that he had a sex problem, Noe also offered to make some phone calls for the purpose of scheduling some help for Ward. According to Eddie Ward, law enforcement arranged for Ward to have

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

4

a phone interview with a counselor at 11:00 a.m. on September 4. Ward was bailed out of jail later that day, September 3, 2020.

¶8.    Eddie Ward testified that he first saw his son about 7:30 a.m. on the morning of September 4, 2020. According to Eddie, Ward came over to his house that morning to discuss some problems he was having with his car and seemed "real tired." Eddie testified that he told Ward to "go on back home and get some rest because you have an interview at 11:00 o'clock and we will take that car later on." Eddie also testified that he and Ward had previously agreed to drive to Tupelo later in the day together to run some errands. According to Eddie, he called Ward a little after 12:00 noon before he left his house to go pick up Ward for their drive to Tupelo. Eddie stated that Ward seemed as if he did not understand what Eddie was saying, and he hung up the phone. At that time, Eddie tried to call Golden because Ward "didn't sound like he was all right." However, Golden did not answer her phone. Eddie proceeded to drive to Ward's home. On his way, Eddie saw Ward's vehicle stopped in the middle of the road. Ward got out of his car and began to approach Eddie's car. Eddie advised Ward to get back in his car, and they would both drive back to Ward's house. As Eddie and Ward began making their way back to Ward's home, Ward pulled his car beside Eddie's and indicated that he needed to pull over to look for his phone. After both cars had pulled over, Ward just stared at Eddie, and Eddie asked Ward twice what was wrong with him. Ward proceeded to approach Eddie's car and "hollered real loud[,]. . . 'I shot [Golden].'" Ward further admitted to Eddie that Golden was dead. Eddie testified that he was shaken up but managed to call 911. As Eddie was on the phone with the 911 dispatcher,

5

he flagged down a deputy sheriff who was coming down County Road 102. Eddie told the deputy that Ward had just told him that he shot his wife.

¶9. Meanwhile, officers from the Lafayette County Sheriff's Department responded to a call claiming that someone had been shot at County Road 1080. When they arrived, officers found Golden lying in a pool of blood on the parking pad in front of duplex number one. Multiple residents of the duplex complex and surrounding residences were interviewed.

¶10. After arriving on the scene, officers recovered a Ruger 9-millimeter pistol and other evidence in the parking area behind and around Golden's vehicle. Also recovered outside in the parking area was the key fob portion of Golden's car key, located to the left of her body. The metal file portion of the car key was found broken off in the ignition of Golden's car. Golden's purse, cell phone, and wallet were all located in her car. Traces of Golden's blood were found on items found in her car. Additionally, a spent shell casing and a copper projectile were found inside the residence. Multiple bloody objects from the couple's bedroom were collected and ultimately tested positive for Golden's blood. The arresting officer testified that Ward had "tiny blood spots" on the back of his shirt and his arm at the time of arrest.[2]

¶11. On February 26, 2021, Ward was charged in a two-count indictment for voyeurism and first-degree murder. In addition to the testimony described above, Ieasha Glover, a neighbor, testified that sometime around 12:00 noon and 1:00 p.m., she heard screaming and looked out her window. Glover testified that she saw Golden running from her apartment and

---

[2] Ward's shirt was lost, and the blood from his arm was never tested.

that she had blood on her face and her hair was messed up. The witness stated that she had not heard any gunshots at that point. Minutes later, after she heard a gunshot, she looked out her window again and saw Golden running from her residence a second time.

¶12. Another neighbor, Jeremy Rice, described hearing a female voice scream, "No! No!" and then heard two gunshots, but he did not see anything. Another neighbor, Nicholas Adams, testified that after he heard a woman scream, "No!" he then heard two bangs and looked out his window. He testified that he saw Ward drop a gun, get into his car, and drive off. Still another neighbor, Clara Fleitas, testified that in the middle of her Zoom class, she heard two loud bangs. When she looked out her window, she saw a car fleeing the neighborhood and identified the driver as Ward. She recognized the car as being one that is usually parked at Golden and Ward's residence. Fleitas grabbed her phone and ran outside and called 911. Fleitas could see a woman lying on the driveway. Ward circled back through the parking area and left again.

¶13. Dr. Mark LeVaughn testified as an expert in forensic pathology. LeVaughn performed the autopsy on Golden's body and described for the jury the injuries he found as a result of the autopsy. LeVaughn found four blunt force injuries, which he described as any injury caused by a non-sharp object. LeVaughn also described three gunshot wounds. The first gunshot wound LeVaughn described entered Golden's right cheek area, then went through the back of her throat area, fracturing facial bones, and exited the left side of her chin, fracturing her mandible. There was an additional gunshot wound to the base of Golden's neck on the right side of the shoulder base. The bullet from that wound perforated Goden's

7

lower neck, went through her airway and the trachea, and exited on the left side of her neck. LeVaughn also described a graze-type gunshot wound that scraped the skin on Golden's left upper chest. LeVaughn further described the wounds as distant gunshot wounds, which means the barrel of the gun was fired at a distance of more than three feet away from Golden. On cross-examination, LeVaughn testified that it was possible that the blunt force injuries were the result of a fight.

¶14. After a three-day jury trial, Ward was found guilty of both counts charged in the indictment. Ward was sentenced to serve five years in the custody of the Mississippi Department of Corrections (MDOC) for Count I and life imprisonment for Count II, with the sentences set to run concurrently. On July 31, 2023, Ward filed a motion for a new trial, which was denied on February 26, 2024. Ward filed his notice of appeal on March 13, 2024.

**ANALYSIS**

¶15. Ward raises the following issues on appeal: (1) he received ineffective assistance of counsel at trial; (2) the court erred in refusing his proposed jury instructions regarding the lesser included offense of manslaughter, self-defense, and the intent requirements for murder and manslaughter; (3) the evidence presented at trial was insufficient to sustain the jury's guilty verdicts for both first-degree murder and voyeurism; and (4) cumulative error deprived Ward of a fair trial. We address these issues below.

### I. Ineffective Assistance of Counsel

¶16. Ward claims that his counsel was ineffective for several reasons that entitle him to a new trial. Concerning the consideration of an ineffective assistance of counsel claim on

8

direct appeal, in *Robinson v. State*, 400 So. 3d 527, 531 (¶14) (Miss. Ct. App. 2025), this

Court stated:

> As an initial matter, we recognize that "this Court typically preserves ineffective-assistance-of-counsel claims for post-conviction review." *Latham* [*v. State*], 299 So. 3d [768,] 773 (¶16) [(Miss. 2020)]. "This is because we are limited to the trial court record in our review of the claim[,] and there is usually insufficient evidence within the record to evaluate the claim [on direct appeal]." *Aguilar v. State*, 847 So. 2d 871, 878 (¶17) (Miss. Ct. App. 2002). We therefore review ineffective assistance of counsel claims on direct appeal when "[1] the record affirmatively shows ineffectiveness of constitutional dimensions, or [2] the parties stipulate that the record is adequate and the Court determines that findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed." *Bell v. State*, 202 So. 3d 1239, 1242 (¶12) (Miss. 2016). This Court may also resolve "ineffective-assistance-of-counsel claims on direct appeal when the record affirmatively shows that the claims are without merit." *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020).

Ward also stipulates that the record here is adequate for appellate review of this issue. The

State agrees but contends the record affirmatively shows that Ward's claims are without

merit. To be successful in a claim for ineffective assistance of counsel,

> [f]irst, the defendant must show that counsel's performance was deficient. This requires showing counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. **Second, the defendant must show that the deficient performance prejudiced the defense**. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or a death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984) (emphasis added). Both prongs of the

*Strickland* test must be proved, or the claim of ineffective assistance of counsel fails. *Id*. As

to the first prong, this Court has held that "the accused is not entitled to errorless counsel, and

9

not counsel judged ineffective by hindsight. Each case is to be decided on the totality of the facts of the entire record." *Stringer v. State*, 454 So. 2d 468, 476 (Miss. 1984). "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence . . . ." *Id*. at 477. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Wilcher v. State*, 863 So. 2d 776, 796 (¶30) (Miss. 2003) (citing *Stringer v. State*, 454 So. 2d 468, 477 (Miss. 1984)). In determining what falls into the category of trial strategy, this Court has held that "[c]ounsel's choice of whether or not to file certain motions, call certain witnesses, ask certain questions, or make certain objections falls within the ambit of trial strategy." *Hill v. State*, 850 So. 2d 223, 226 (¶14) (Miss. Ct. App. 2003) (citing *Scott v. State*, 742 So. 2d 1190 (¶14) (Miss. Ct. App. 1999)). Further, "[a] strategic decision to pursue less than all plausible lines of defense will rarely, if ever, be deemed ineffective if counsel first adequately investigated the rejected alternative." *Cole v. State*, 666 So. 2d 767, 776 (Miss. 1995) (quoting *Adams v. Wainwright*, 709 F. 2d 1443, 1445 (11th Cir. 1983).

### A. Severance

¶17. First, Ward claims that he received ineffective assistance of counsel because his attorney failed to request that the two counts of his indictment be severed. However, it is important to note that Ward's counsel vehemently sought to introduce evidence at trial of the

specific details of a phone call interview that Ward allegedly participated in on the day of his wife's death. Counsel argued that the phone call stemming from Ward's voyeurism charge should be admissible to support Ward's defense to his first-degree murder charge. That being said, the State argues that defense counsel had a calculated reason for failing to request that Ward's indictment be severed and should be considered trial strategy.

¶18. This Court reviews the circuit court's ruling to deny severance under an abuse-of-discretion standard of review. *Stribling v. State*, 81 So. 3d 1155, 1162 (¶30) (Miss. Ct. App. 2011). Mississippi Code Annotated section 99-7-2 (Rev. 2020) provides:

> Two (2) or more offenses which are triable in the same court may be charged in the same indictment with a separate count for each offense if: (a) the offenses are based on the same act or transaction; or (b) the offenses are based on two (2) or more acts or transactions connected together or constituting parts of a common scheme or plan.

In *Corley v. State*, 584 So. 2d 769, 772 (Miss. 1991), the Mississippi Supreme Court established a three-prong test to determine the appropriateness of severance, specifically, reasoning:

> In making its determination regarding severance, the trial court should pay particular attention to whether the time period between the occurrences is insignificant, whether the evidence proving each count would be admissible to prove each of the counts, and whether the crimes are interwoven.

*Id*. at 772 (footnote omitted).

¶19. At first glance, the two counts in Ward's indictment may seem unrelated, but the series of events that took place between the alleged voyeurism incident and Golden's death require closer scrutiny. Golden's murder occurred on the day after Ward was released from custody on the voyeurism charge. It is undisputed that both Golden and Ward's parents went

to the sheriff's department on the day of Ward's release, September 3, 2020, to inquire about the specific circumstances surrounding Ward's voyeurism charge. It is also undisputed that during that conversation with Investigator Noe, Golden was advised of the details of the voyeurism allegation. Noe also testified that during that conversation, he suggested that Ward's firearms be removed from the couple's residence as a precaution for everyone's safety. Further, Noe testified that Ward admitted to him that he had looked in the Todd sisters' window "three or four times," but only once was one of the sisters in the bedroom. Ward told Noe he had "a sexual problem and needed help." After his discussion with Ward, Noe offered to make some calls to assist Ward in finding some help. As a result of Noe's assistance, Ward allegedly participated in a pre-arranged phone interview regarding his sexual tendencies shortly before Golden's body was found by law enforcement. As stated previously, defense counsel highlighted the nature of the alleged phone call on September 4, 2020, as well as the short proximity of time between that call and Golden's death. It is clear from the record that counsel did so to perpetuate a narrative to support Ward's heat of passion or self-defense argument. To now claim that the two counts are unrelated and should have been severed is contradictory to the defense's position at trial. Ward has failed to overcome the presumption that not requesting a severance was a matter of "sound trial strategy." This issue is without merit.

### B. *Batson* Challenges

¶20. Second, Ward claims that his counsel was ineffective for failing to object to the State's peremptory strikes during jury selection based on *Batson v. Kentucky*, 476 U.S. 79,

12

(1986).[3] As a result, Ward contends that an all-white jury was empaneled, which created an inference that minority veniremen were struck based upon their race. However, there is no proof in the record as to the racial composition of the empaneled jury or the race of the four prospective jurors the State struck. In *Camper v. State*, 24 So. 3d 1072, 1076 (¶17) (Miss. Ct. App. 2010), this Court stated:

> Trial courts and attorneys have a duty to populate the record with adequate information concerning the racial composition of prospective jurors in order for the trial and appellate courts to fully analyze the voir dire proceedings. . . .The record before us does not contain adequate information to determine the racial composition of the venire or petit jury.

¶21. In any event, in *Sanders v. State*, 825 So. 2d 53, 57 (¶6) (Miss. Ct. App. 2002), the defendant made an identical claim in the direct appeal of his convictions of kidnapping, capital rape, sexual battery, and possession of a firearm by a felon. The court reasoned there:

> Sanders contends that he was provided ineffective assistance of counsel when his attorney failed to make a challenge to the peremptory strikes made by the State during the jury selection process based on *Batson v. Kentucky*, 476 U.S. 79 (1986). *Batson* challenges are utilized to contest whether one side is utilizing its peremptory challenges to exclude potential jurors because of some discriminatory basis. *McGilberry v. State*, 741 So. 2d 894, 923 (¶119) (Miss. 1999). The record before this Court is silent on the racial composition of the jury making it impossible to conclude whether a *Batson* challenge was warranted and if the failure to make such a challenge was prejudicial to Sanders. *Hall* [*v. State*], 735 So. 2d [1124,] 1128 (¶12) [(Miss. Ct. App. 1999)]. The decision whether to assert a *Batson* challenge is part of the attorney's trial strategy and this court must defer to the attorney's discretion. *Id*. Sanders has not proven that he was prejudiced in any fashion by his attorney's decision to not assert a *Batson* challenge. This issue is without

---

[3] In *Ross v. State*, 16 So. 3d 47, 60 (¶33) (Miss. Ct. App. 2009), this Court stated:

"[A]n attorney's decision not to make a *Batson* challenge does not amount to ineffective assistance of counsel absent a showing of prejudice to the defendant." *Turner v. State*, 953 So. 2d 1063, 1070 (¶21) (Miss. 2007).

merit.

As in *Sanders*, the record in this case is silent as to the racial composition of the jury, and there has been no evidence shown of prejudice to Ward.

¶22.    Ward contends on appeal that it is not necessary to show "*Strickland*" prejudice in order to obtain a new trial. Instead, he argues that the case should be remanded to the trial court for an evidentiary hearing:

> If "even a single prospective juror" is struck from the panel "for a discriminatory purpose," clear constitutional error has occurred. Based on the strength of the prima facie case, counsel was deficient for not raising a timely objection. The Court should thus remand this matter for a hearing – so the prosecutor may offer race-neutral reasons for any strike and allow the trial court an opportunity to assess those reasons in light of all of the evidence in the record. If, after such a hearing, Mr. Ward demonstrated that the reasons offered by the prosecutor, and not an appellate court, were pretextual, then Mr. Ward would have shown prejudice.

However, we find that the record does not reveal a "prima facie case" of purposeful, racial discrimination by the State in the jury selection process. In *Perry v. State*, 949 So. 2d 764, 766-67 (¶6) (Miss. Ct. App. 2006), the court described what is necessary to establish a prima facie case:

> To establish a prima facie case of discrimination, the party must demonstrate: (1) that he or she is a member of a cognizable racial [or gender] group; (2) that the opposing party has exercised peremptory challenges against members of a particular race; and (3) that the facts and circumstances raise an inference that the party exercising the peremptory strikes does so for the purpose of striking a particular race [or gender]. See *Snow v. State*, 800 So. 2d 472, 478 (¶ 10) (Miss 2001).

While the record may reveal that the defendant is a member of a cognizable racial group, the record does not provide support for the second and third elements of a prima facie case.

¶23. Further, Ward argues that trial counsel's failure to raise a *Batson* challenge to the State's peremptory challenges resulted in a "structural" error that must be automatically reversed. However, the Mississippi Supreme Court specifically rejected this argument in *Powers v. State*, 371 So. 3d 629, 682-84 (¶¶203-11) (Miss. 2023).

¶24. Ward has failed to show or argue on appeal that *he* suffered any prejudice as a result of his trial counsel's decision not to raise a *Batson* challenge to the four peremptory challenges used by the State during jury selection. However, due to the state of the record, we dismiss Ward's claim that he received ineffective assistance of counsel as a result of trial counsel's failure to raise a *Batson* challenge, without prejudice to his ability to raise this specific claim in a properly filed motion for post-conviction collateral relief.

### C. Cumulative Error

¶25. Finally, Ward argues that this Court should apply the doctrine of cumulative error and find that his counsel was ineffective at trial. Ward claims two additional deficiencies with counsel to support his cumulative error argument. First, Ward claims that his counsel erred in failing to cross-examine Jody and only briefly cross-examining Rachel. Lastly, Ward claims that his counsel was deficient in failing to file a timely notice to the trial court that he intended to pursue an insanity defense.

¶26. In *Turner v. State*, 953 So. 2d 1063 (Miss. 2007), the Mississippi Supreme Court held, "Generally, an attorney's decision to call certain witnesses and ask certain questions 'falls within the ambit of trial strategy and cannot give rise to an ineffective assistance of counsel claim.'" *Id*. At 1073 (¶36) (quoting *Bell v. State*, 879 So. 2d 423, 434 (Miss. 2004) (quoting

*Jackson v. State*, 815 So. 2d 1196, 1200 (Miss. 2002))). Ward does not specify any additional questions that his counsel should have asked Rachel Todd on cross-examination, or what additional information could have been obtained from Jody Todd. There is nothing in the record that indicates how Ward was prejudiced by his counsel limiting his cross-examination of the Todd sisters, especially in light of the testimony that Ward admitted to looking into the window on multiple occasions.

¶27. Ward contends on appeal that his trial counsel was ineffective for failing to timely disclose an expert witness and for failing to give notice of his intent to pursue an insanity defense. However, Ward admits in his brief that he suffered no prejudice from his trial attorney's late filing of the notice to pursue the insanity defense.[4] Because we find no deficiency in Ward's trial counsel's representation, we find that cumulative error does not apply.

## II. Refusal of Jury Instructions

¶28. Secondly, Ward argues that the trial court erred in refusing jury instructions he proposed. Instruction D-1 was a lesser-included offense instruction for heat of passion manslaughter. Instruction D-2 was a self-defense instruction, and instruction D-4 was an instruction attempting to define deliberate design and distinguish deliberate design from heat of passion. Instruction D-5 was another one that attempted to define "deliberate design." Each of these four instructions was refused by the trial court.

---

[4] Ward's trial counsel proffered the testimony of the proposed expert, Dr. Reb McMichael, and he testified that, in his opinion, Ward was not insane at the time of the murder.

## A. Heat of Passion Manslaughter Instruction D-1

¶29. We will first consider the trial court's denial of Instruction D-1, the lesser-included offense, heat-of-passion manslaughter instruction. In *McCune v. State*, 989 So. 2d 310, 319 (¶15) (Miss. 2008), the supreme court set forth the necessary elements of heat of passion manslaughter as follows:

> Manslaughter is defined as "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense. . . ." Miss. Code Ann. § 97-3-35 (Rev. 2006) . . . . This Court has defined "heat of passion" as:
>
> > [a] state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.
>
> *Agnew v. State*, 783 So. 2d 699, 703 (Miss. 2001) (quoting *Graham v. State*, 582 So. 2d 1014, 1017 (Miss. 1991)) . . . . "[T]here must be such circumstances as would indicate that a normal mind would be roused to the extent that reason is overthrown and passion usurps the mind destroying judgment." *Agnew*, 783 So. 2d at 703-704 (citing *Graham*, 582 So. 2d at 1018).

¶30. In *Wallace v. State*, 369 So. 3d 83, 87-88 (¶¶13-15) (Miss. Ct. App. 2023), this Court discussed the standard of review for refusing to give a lesser-included-offense manslaughter instruction:

> **Here, we review de novo the refusal of lesser-included-offense instructions, "as this is a question of law."** *Downs v. State*, 962 So. 2d 1255, 1258 (¶10) (Miss. 2007). **"A defendant has a right to a lesser-included-offense instruction if there is some evidence from which**

17

**a reasonable juror could find him both not guilty of the indicted offense and guilty of the lesser-included offense.**" *Curtis v. State*, 298 So. 3d 446, 451 (¶11) (Miss. Ct. App. 2020) (citing *Gilmore v. State*, 119 So. 3d 278, 286 (¶13) (Miss. 2013)), *cert. denied*, 316 So. 3d 202 (Miss. 2021). But "lesser-included-offense instructions should not be indiscriminately granted; instead, the jury should not be presented with a lesser-included-offense instruction unless the record provides an evidentiary basis for the instruction." *Franklin v. State*, 136 So. 3d 1021, 1026 (¶11) (Miss. 2014) (quotation marks omitted). "Additionally, lesser-included-offense instructions should not be granted on mere speculation." *Id.*

(Emphasis added). Accordingly, we must conduct a de novo review of the record to determine whether there was "some" evidence to support the requested heat of passion manslaughter instruction.

¶31. During opening statements, defense counsel told the jury:

Thank you so much. Good afternoon. I want you to know that this, in my opinion, my professional opinion, is a manslaughter case. It's not a murder case. And in two or three days when we get to the end of it, this proceeding, I am going to come back up here and I am going to ask you for a manslaughter verdict and I will give you the basis for my request then . . . [.]

From the outset, Ward's theory of defense was shown to be that this was not a murder case; instead, it was a manslaughter case. Defense counsel stated that he would argue the basis for his request during closing arguments.

¶32. The trial proceeded, and both the State and the defense presented their evidence as set forth above. At the jury instruction conference, after the close of all the evidence, the defense offered Instruction D-1, and the State objected to the instruction. The State argued that there was no evidence in the record to support a heat of passion manslaughter instruction.[5] The State pointed out that there was no evidence of any action by the victim that provoked or

---

[5] The State did not challenge the form of the instruction.

18

enraged Ward to commit the act. In response, the following exchange occurred between defense counsel, David Hill, and the circuit judge:

Hill: It's a slippery slope, judge, when we start refusing lessor included instructions. And it's even slipperier slope when we start refusing to allow the defendant to pursue his legal theory of defense and there is plenty of circumstantial inference related evidence in this case to justify lessor included. And certainly justify allowing us to pursue our theory of defense. [In the] *Miller* case [the] Mississippi Supreme Court says that we are entitled to pursue our theory of defense even if on the flimsiest of evidence and that is a sure way in my opinion to get us sent back for another trial.

Judge: Help me fledge out what you consider the evidence is to support the instruction granting the instruction.

Hill: You can start with the fact that the gun belonged to Danielle Golden. It's her gun. Okay. We know that she kept it in her car. We know that on the day before she was upset in the presence of Emma Ward and Nathaniel Noe when Mr. Noe was disclosing to her [the] history of her husband's conduct. And we know that that upset her. We know from the record that there was a scheduled 11:00 o'clock interview the next day. We know that or we infer that if Golden was upset on Thursday in the presence of Mr. Noe that she would have been even more upset the next day when she is hearing an hour long interview. We can assume and infer that there was an altercation inside the apartment. We have her blood on the sheets. We have her blood on shoes, we have blood drops on the floor. We know, don't have to infer, that Mrs. Golden was seen outside by Mrs. Glover with blood on her face. We know that she went into her car at some point. She went into her car before she was shot. We know that she kept her gun in the car. We know that after she went into her car after she was outside and Ms. Glover saw her outside with blood on her face Mrs. Glover saw her for some reason go back into the apartment. And we know that within 3 minutes, not more than 3 minutes, maybe not even 3 minutes there was, they both exited with him with the gun in his hand. We know that there was, according to Jarrett Bundren, what appeared to be a struggle for the firearm because of the errant

19

> shot into the wall, into the hallway and in the living room. The jury can infer that there was a struggle. And they can infer that he took the gun from her. I think that is more than sufficient for me to argue manslaughter. And it's certainly sufficient for me to be allowed to pursue the theory of defense. And you are on a slippery slope, thin ice, Judge.

The State, in response, argued that the fact that the victim owned a gun does not support a self-defense instruction. The State argues further that the fact that the victim was upset on the previous day because she was told of her husband's voyeurism does not support a self-defense instruction. The State contends that there is no evidence of an "altercation," but, instead, the evidence shows that all the blood found belonged to the victim, which the State argues shows that the victim was being assaulted. Citing *Avera v. State*, 761 So. 2d 900 (Miss. Ct. App. 2000), the State told the judge that there is no evidence of any act by the victim that could be said to have provoked the defendant and support a manslaughter instruction. The State concluded by telling the trial judge that the inferences that the defense tried to draw were not based upon facts that were in evidence. The defense replied by continuing their argument that it was entitled to present its theory of defense to the jury so long as there is some supporting evidence. Defense counsel cited *Miller v. State*, 733 So. 2d 846, 848-49 (¶7) (Miss. Ct. App. 1998), where our Court stated:

> It is a basic tenet of our criminal system that a defendant is entitled to fully develop his theory of the defense and, so long as there is some supporting evidence in the record, to have the jury instructed as to the law on that theory. *Manuel v. State*, 667 So. 2d 590, 591 (Miss.1995). **It is not necessary that the quality of the proof in support of the defendant's theory rise to any certain level of credibility or that some minimum quantum of proof be developed.** *Id.* at 593. **Even the flimsiest of evidence, so long as it has some probative value, is enough to permit a defendant to have the jury instructed on his theory of the case.** *Hester v. State*, 602 So. 2d 869, 872

20

(Miss. 1992).

(Emphasis added). After hearing extensive arguments from both sides, the trial judge refused proposed Instruction D-1. Citing *Wallace* the court found that the inferences argued by the defense were nothing more than speculation. The court found that there was insufficient evidence to give the manslaughter instruction.

¶33. Our process to review the trial court's decision is set out in *Buchanan v. State*, 84 So. 3d 812, 815 (¶8) (Miss. Ct. App. 2011), as follows:

> In order to decide whether a proposed jury instruction is supported by the evidence, **"we must consider all of the evidence in the light most favorable to the party requesting the instruction. That party must also be given the benefit of all favorable inferences that may reasonably be drawn from the evidence."** *Booze v. State*, 964 So. 2d 1218, 1221 (¶14) (Miss. 2007) (quoting *Jones v. State*, 798 So. 2d 1241, 1254 (¶40) (Miss. 2001)). **Moreover, a trial court "should err on the side of inclusion rather than exclusion" for proposed jury instructions.** *Id.* The supreme court has long held that "only where the evidence could only justify a conviction of the principal charge should a lesser offense instruction be refuted." *Jones v. State*, 798 So. 2d 1241, 1253 (¶38) (Miss. 2001) (quoting *Taylor v. State*, 577 So. 2d 381, 383 (Miss.1991)). **"A lesser-included offense instruction must be granted where a reasonable juror could not on the evidence exclude the lesser-included offense beyond a reasonable doubt."** *Id*. (quoting *Taylor*, 577 So. 2d at 383-84). Another factor "to be considered is the disparity in maximum punishments between the offenses. A great disparity is a factor in favor of giving the lesser included offense instruction." *Id*.

(Emphasis added). Ward argues that there was sufficient circumstantial evidence and reasonable inferences to support giving the instruction. In *Beasley v. State*, 362 So. 3d 112, 123 (¶¶36-37) (Miss. Ct. App. 2023), this Court stated:

> Circumstantial evidence is "evidence which, without going directly to prove the existence of fact, gives rise to a logical inference that such a fact does exist." *Keys v. State*, 478 So. 2d 266, 268 (Miss. 1985). "A circumstantial-evidence case is one where the State is 'without a confession

21

and wholly without eyewitnesses to the gravamen of the offense charged.'" *Chism v. State*, 253 So. 3d 343, 349 (¶29) (Miss. Ct. App. 2018) (quoting *Garrett v. State*, 921 So. 2d 288, 291 (¶17) (Miss. 2006)).

Mississippi caselaw has a "clear and longstanding position that circumstantial evidence and direct evidence carry the same weight." *Nevels v. State*, 325 So. 3d 627, 632 (¶14) (Miss. 2021); accord *Williams v. State*, 305 So. 3d 1122, 1129 (¶17) (Miss. 2020) ("Evidence is either direct or circumstantial. And both types of evidence carry the same weight."); *Cardwell v. State*, 461 So. 2d 754, 760 (Miss. 1984) ("Circumstantial evidence is entitled to the same weight and effect as direct evidence[,] and this Court has upheld convictions based solely on circumstantial evidence."); *Bogard v. State*, 233 So. 2d 102, 105 (Miss. 1970) ("[I]t is pointed out that circumstantial evidence, ordinarily, is entitled to the same effect and weight as direct evidence and may, in the concrete, be the more reliable and stronger." (internal quotation marks omitted)).

¶34. We must review the record and consider the evidence and make any inferences in the light most favorable to Ward's request for a heat of passion manslaughter instruction. We note that the evidence shows the victim's blood was found in the bedroom. Dr. LeVaughn testified that the blunt force injuries he found during his autopsy could have been inflicted in a fight. Glover testified that the first time she saw Golden leave the house, which was before she heard any gunshots, Golden had blood on her face and no shoes, and her hair was messed up. The evidence further shows that although Glover did not see Golden enter her car, items were recovered from inside Golden's car that had traces of her blood on them. The testimony also showed that Golden routinely kept her gun in the glove box in her vehicle and that Ward's firearms had been removed from the home prior to this event. Testimony showed that the gun used to kill Golden, which was recovered from the scene, was owned by Golden. Investigator Bundren testified that the trajectory of the shot through the wall could very well indicate that Ward and Golden were struggling for the gun. This testimony

22

is circumstantial evidence that supports Ward's contention that Golden brought the gun into the house and that a shot was fired during a struggle over the weapon. The fact that the testimony shows that Ward ended up with the weapon supports the reasonable inference that he took the gun away from Golden. Ward then used that gun to kill Golden.

¶35.    The separate opinion contends the only support for giving a heat of passion manslaughter instruction is "speculation and conjecture put forth by Ward's counsel." Not true. There is direct evidence that it was Golden's gun that was used by Ward to kill her. There is direct evidence that Ward's parents removed all of Ward's guns from the residence the day before the shooting. There is direct evidence that Golden's blood was found inside her car. There is direct evidence that Golden kept her gun in the glove box of her car. There is direct evidence that Golden was first seen running from her residence with her face bloody and her hair messed up, before any gunshot was heard. There is direct evidence that a bullet hole was found in an inside wall of the residence as described above. The logical inferences that *could be drawn* from the direct and circumstantial evidence set out above supports the argument by Ward that

1.    Golden was not pleased with the fact Ward had been charged with voyeurism.
2.    There was initially some physical confrontation that day that caused Golden to be bloody and running from the residence.
3.    While dripping blood inside her car, Golden retrieved her gun from the glove box and went back inside the residence.
4.    Because Golden came back with her gun, Ward was provoked to the point that he was enraged "to the extent that reason is overthrown and passion usurps the mind destroying judgment" and he took the gun from Golden and killed her.

¶36.    The jury was not *required* to view the evidence in the light most favorable to Ward's

23

request for a heat of passion manslaughter instruction as we are pursuant to *Buchanan*; however, it would not be unreasonable for the jury to do so. Therefore, viewing this evidence as we must, we find that the trial court erred in refusing Ward's jury instruction on heat of passion manslaughter. Therefore, Ward's conviction of first-degree murder is reversed, and we remand the charge to the circuit court for a new trial.

### B.      Refusal of Jury Instructions D-2, D-4, and D-5

¶37.    Because we reverse and remand Ward's conviction of first-degree murder and remand, as stated above, the issues relative to the other defense instructions are moot. *See Brown v. State*, 764 So. 2d 463, 466 (¶4) (Miss. Ct. App. 2000). However, we note that the trial court gave the State's elements instruction for first-degree murder, which required the State to prove beyond a reasonable doubt that Ward did not act in necessary self-defense, but the court refused to give the defense instruction that would have defined self-defense. There was no other instruction defining self-defense. Where the court finds that the issue of self-defense has been raised and places this burden of proof upon the State, the jury must also be given an instruction that defines self-defense in order for the jury to be sufficiently instructed. *See Crook v. State*, 105 So. 3d 353, 360 (¶18) (Miss. Ct. App. 2012).

### III.    Sufficiency of the Evidence

¶38.    In *Eubanks v. State*, 341 So. 3d 896 (¶41) (Miss. 2022), the Mississippi Supreme Court set forth the standard of review concerning the legal sufficiency of the evidence to support a conviction as follows:

> "When reviewing a challenge for sufficiency of the evidence, this Court must determine whether, 'after viewing the evidence in the light most favorable to

the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Naylor v. State*, 248 So. 3d 793, 796 [(¶8)] (Miss. 2018) (internal quotation marks omitted) (quoting *Ambrose v. State*, 133 So. 3d 786, 791 [(¶16)] (Miss. 2013)). "The prosecution must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence." *Id*. (internal quotation marks omitted) (quoting *McClain v. State*, 625 So. 2d 774, 778 (Miss. 1993)).

> [I]f a review of the evidence reveals that it is of such quality and weight that, "having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense," the evidence will be deemed to have been sufficient.

*Id*. at 909-10 (¶41) (alteration in original) (quoting *Shelton v. State*, 214 So. 3d 250, 256 (Miss. 2017)). Further, in *Butler v. State*, 354 So. 3d 308, 320 (¶32) (Miss. Ct. App. 2022), this Court held:

> In reviewing the legal sufficiency of the evidence, our authority to disturb the jury's verdict is quite limited. *Clayton v. State*, 652 So. 2d 720, 724 (Miss. 1995). This Court has held that "[t]he jury is charged with the responsibility of weighing and considering conflicting evidence, evaluating the credibility of witnesses, and determining whose testimony should be believed. The jury has the duty to determine the impeachment value of inconsistencies or contradictions as well as testimonial defects of perception, memory, and sincerity." *Ford v. State*, 737 So. 2d 424, 425 (¶8) (Miss. Ct. App. 1999) (citation omitted).

### A.    Count I: Voyeurism

¶39.    Jody Todd testified that the voice she heard outside her window on August 28, 2020 was Ward's voice. Both Jody Todd and Rachel Todd testified as to their previous uncomfortable interactions with Ward leading up to the night of the incident. Further, Investigator Shoffner testified that in the course of her interview with Ward, he admitted to her that he had "messed up" and said he would leave the Todd sisters alone. Further, law

enforcement testified that Ward admitted to looking into the Todd sisters' bedroom window three or four times and that one of the sisters was in the bedroom only one time. The Todd sisters' testimony and Ward's admission are legally sufficient to support the jury's conviction as to Count I.

## B. Count II: First-Degree Murder

¶40. Although we are reversing Ward's conviction of first-degree murder, we must consider the legal sufficiency of the evidence to support the conviction because if the evidence was legally insufficient, we would be required to reverse and render an acquittal. *See Roncali v. State*, 412 So. 3d 1235, 1245 (¶46) (Miss. Ct. App. 2025). The State put on uncontested proof that Ward shot and killed Golden, including Ward's admission. The proof showed that Golden suffered blunt force injuries as well as gunshot injuries. There is no evidence that Ward was injured in any manner. There is no direct evidence as to who or what started the series of events. The jury was instructed as follows:

> In this instruction, "deliberate design" means a person decides to unlawfully kill another person, and there is no legally justifiable or excusable reason for doing so. The decision to kill a person can be formed very quickly and may occur only moments before the actual act of killing. However, deliberate design cannot be formed at the exact moment of the act of killing.

While no one actually saw Ward shoot Golden, there is sufficient evidence for the jury to believe, as the State argued, that Ward had a gun and was chasing Golden, as she was running away and screaming, "No!" and Ward shot her twice. The State further argued that there was no evidence that Ward shot Golden in self-defense, especially when there was evidence that she was trying to run away from him. We find that the evidence was legally

26

sufficient to support the conviction of first-degree murder. However, because we find the trial court erred by failing to give the defense's requested heat of passion manslaughter instruction, we reverse the conviction and remand for a new trial.

## IV. Cumulative Error

¶41. Finally, Ward claims that all the alleged errors, when combined, constitute cumulative error. As discussed above, we find error only with the failure to give the heat of passion manslaughter instruction. This issue is without merit.

## CONCLUSION

¶42. We find no error related to Ward's conviction of voyeurism as charged in Count I of the indictment, and therefore, we affirm Ward's conviction and sentence for that charge. However, as discussed above, because we find that the trial court erred by refusing Ward's heat of passion manslaughter instruction, his conviction and sentence for first-degree murder as charged in Count II of the indictment is reversed, and we remand for a new trial.

¶43. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., McDONALD, McCARTY, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WILSON, P.J., AND WESTBROOKS, J., CONCUR IN PART AND DISSENT IN PART WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY CARLTON, P.J., AND McDONALD, J.; WILSON, P.J., JOINS IN PART.**

**LAWRENCE, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶44. I agree with the majority's decision to affirm Ward's voyeurism conviction. However, I disagree with the decision to reverse his murder conviction because the trial court refused to give a heat-of-passion manslaughter instruction.

27

¶45. While "[a] defendant is entitled to have jury instructions given which present his theory of the case . . . this entitlement is limited in that **the court may refuse an instruction** which incorrectly states the law, is covered fairly elsewhere in the instructions, or is **without foundation in the evidence**." *Rodgers v. State*, 777 So. 2d 673, 676 (¶12) (Miss. Ct. App. 2000) (emphasis added) (citing *Murphy v. State*, 566 So. 2d 1201, 1206 (Miss. 1990); *Young v. State*, 451 So. 2d 208, 210 (Miss. 1984); *United States v. Robinson*, 700 F.2d 205, 211 (5th Cir. 1983)). In this case, Ward "could be entitled to an instruction on heat-of-passion manslaughter **only if there is an evidentiary foundation** to support the lesser-included offense." *Johnson v. State*, 391 So. 3d 217, 223 (¶15) (Miss. Ct. App. 2024) (emphasis added) (citing *McCune v. State*, 989 So. 2d 310, 319 (¶17) (Miss. 2008)).

¶46. The majority heavily relies on the trial counsel's argument to the court in support of the heat-of-passion manslaughter instruction. For instance, **counsel** stated that Golden going to the car to get the gun proved there was a struggle between Ward and Golden. On cross-examination, **counsel** asked Investigator Bundren, "[Golden] and [Ward] very well could have been struggling for the gun[,] right?" to which Investigator Bundren responded, "They very well **could**." (Emphasis added). In his closing argument, Ward's **counsel** stated that "[t]he jury can infer that there was a struggle. And they can infer that [Ward] took the gun from [Golden]."

¶47. But crucially, "**arguments of counsel are not evidence**." *O'Kelly v. State*, 267 So. 3d 282, 296 (¶55) (Miss. Ct. App. 2018) (emphasis added) (quoting *One 1970 Mercury Cougar v. Tunica County*, 115 So. 3d 792, 796 (¶20) (Miss. 2013)). Likewise, "[q]uestions

28

asked by lawyers are not evidence—only the answers given by witnesses." *Id.* (quoting *May v. State*, 460 So. 2d 778, 783 (Miss. 1984)). Ward needed to provide an **evidentiary** foundation in order to support giving a heat-of-passion manslaughter instruction, not mere speculation or conjecture from his own counsel. That mere speculation is on display in this exchange between the judge and Ward's counsel:

**BY THE COURT:** Help me fledge out what you consider the evidence is to support the instruction granting of the instruction.

**BY MR. HILL:** You can start with the fact that the gun belonged to Danielle Golden. It's her gun. Okay. We know that she kept it in her car. We know that on the day before she was upset in the presence of Emma Ward and Nathaniel Noe when Mr. Noe was disclosing to her history of her husband's conduct. And we know that that upset her. We know from the record that there was a scheduled 11:00 o'clock interview the next day. We know that or **we infer that** if Golden was upset on Thursday in the presence of Mr. Noe that she would have been even more upset the next day when she is hearing an hour long interview. We can **assume and infer** that there was an altercation inside the apartment. We have her blood on the sheets. We have her blood on shoes, we have blood drops on the floor. We know, **don't have to infer**, that Mrs. Golden was seen outside by Mrs. Glover with blood on her face. We know that she went into her car at some point. She went into her car before she was shot. We know that she kept her gun in her car. We know that after she went in her car after she was outside and Mrs. Glover saw her outside with blood on her face. Mrs. Glover saw her for some reason go back into the apartment. And we know that within 3 minutes, not more than 3 minutes maybe not even 3 minutes there was, they both exited with [Ward] with the gun in his hand. We know that there was, according to Jarrett Bundren, what appeared to be a struggle for the firearm because of the errant shot into the wall, into the hallway and in the living room. **The jury can infer that there was a struggle. And they can infer**

29

**that he took the gun from her.** I think that is more than sufficient for me to argue manslaughter. And it's certainly sufficient for me to be allowed to pursue the theory of the defense. And you are on a slippery slope, thin ice, Judge.

(Emphasis added). Ward's counsel leaned heavily, if not solely, on speculation rather than evidence supporting his theory of defense. The courts of this state routinely and consistently rely on evidence to do their work, not speculation. The criminal justice system requires evidence beyond a reasonable doubt before justice is dispensed, not speculation. Giving a jury instruction requires an evidentiary basis, not speculation.

¶48. Turning to the evidence that **was** presented, **no one** saw a struggle between Ward and Golden for the gun. The blood found in the home was **only** Danny's, not Ward's blood. Investigator Bundren never testified that there "appeared to be a struggle for the firearm[.]" He answered that there "could" have been a struggle in response to Ward's counsel asking him that precise question. In addition, Ward did not testify in order to give his version of how the events unfolded. Instead, he called only three witnesses. First, Officer McNeese testified that he noticed small drops of blood on the back of Ward's shirt and arm upon arresting him. Officer McNeese testified that the shirt should have been preserved for evidence, but for reasons unbeknownst to him, it was not. Next, Ward's mother Emma explained that while Ward was in custody for voyeurism, Officer Noe suggested that all firearms be removed from Ward's house. Ward's family removed his firearms from the home; Danny kept her own firearm in her car. Ward's third witness did not even testify before the jury. Nothing contained in the defense's case sufficed as evidence for heat-of-

30

passion manslaughter.

¶49. The majority relies on attorney speculation that Golden brought the gun inside the house, causing Ward to become "enraged." But no one saw Golden carrying a gun. She was only seen going to her vehicle! What if Ward had already retrieved Golden's gun from her vehicle before she went outside? A bullet casing and a bullet hole inside the house tell us nothing about Ward's "enraged" state, or lack thereof. We do not know if Golden or Ward was the one who actually got the gun from Golden's vehicle! There is simply not enough evidence to hold that the trial court abused its discretion in refusing to give a manslaughter instruction based on the speculative arguments of his counsel.

¶50. In summary, no one—not even Ward's own witnesses—testified to seeing an argument or struggle between Ward and Golden. At the conclusion of Ward's trial, the jury was given the following instruction for murder:

> SHERARD EUGENE WARD is charged in Count 2 with murder. If you find beyond a reasonable doubt from the evidence in this case that:
>
> 1.    On or about September 4, 2020 in Lafayette County;
> 2.    SHERARD EUGENE WARD unlawfully and with deliberate design killed Marisha Golden a human being, by shooting Marisha Golden in the face and neck and;
> 3.    SHERARD EUGENE WARD was not acting in self-defense; then you shall find SHERARD EUGENE WARD guilty as charged.
>
> If the State did not prove any one of the above listed elements beyond a reasonable doubt, then you shall find SHERARD EUGENE WARD not guilty of Count 2.

Everything referenced in that instruction was supported by testimonial evidence at trial.

¶51. On the other hand, any evidence supporting a manslaughter instruction was mere

speculation and conjecture put forth by Ward's counsel. It is, again, fundamental in Mississippi jurisprudence that jury instructions be supported by evidence. *Morris v. State*, 777 So. 2d 16, 29 (¶63) (Miss. 2000) (citing *Wilson v. State*, 592 So. 2d 993, 997 (Miss. 1991)). Therefore, I respectfully disagree with the portion of the majority's decision to reverse Ward's murder conviction and remand.

**CARLTON, P.J., AND McDONALD, J., JOIN THIS OPINION. WILSON, P.J., JOINS THIS OPINION IN PART.**